UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

| | |
|---|---|
| BORDER AREA MENTAL HEALTH SERVICES, INC.; COUNSELING ASSOCIATES, INC.; FAMILIES AND YOUTH, INC.; SOUTHERN NEW MEXICO HUMAN DEVELOPMENT, INC.; SOUTHWEST COUNSELING CENTER, INC.; THE COUNSELING CENTER, INC.; VALENCIA COUNSELING SERVICES, INC.; AND HOGARES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> SIDONIE SQUIER, SECRETARY OF THE HUMAN SERVICES DEPARTMENT OF THE STATE OF NEW MEXICO, <br><br> Defendant. | <br><br><br><br><br><br><br><br><br><br><br><br><br><br> Case No.: |

## COMPLAINT FOR INJUNCTIVE RELIEF UNDER THE CIVIL RIGHTS ACT

Plaintiffs Border Area Mental Health Services, Inc.; Counseling Associates, Inc.; Families And Youth, Inc.; Southern New Mexico Human Development, Inc.; Southwest Counseling Center, Inc.; The Counseling Center, Inc.; Valencia Counseling Services, Inc.; and Hogares, Inc. allege as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction to enjoin the violation of the civil rights of each plaintiff under 28 U.S.C. Section 1343(3) and (4). The Court also has jurisdiction to resolve the

1

important federal questions raised in this action pursuant to 28 U.S.C. Section 1331.

2. Venue is appropriate in this judicial district because the Director of the Secretary of the New Mexico Human Services Department ("State Department") maintains offices within this judicial district and the acts alleged herein occurred within this juridical district. Moreover, each defendant is a resident of this judicial district.

## OVERVIEW

3. Each plaintiff is a longstanding provider of mental health services to Medicaid and other state government sponsored mental health patients, residents and clients. Unless this Court issues immediate injunctive relief under the Civil Rights Act, the State Department will continue to deny each plaintiff its right to due process of the law guaranteed under the Fourteenth Amendment to the United States Constitution. Specifically, without giving any of the plaintiffs adequate notice of the allegations against them and without affording plaintiffs a "name-clearing" hearing of any type, defendant Squier has caused to be published in the media throughout New Mexico and elsewhere, including in New Mexico newspapers, highly inflammatory and highly damaging allegations of health care fraud and abuse against each plaintiff, which allegations are false and which allegations each plaintiff strongly denies. The State Department has simultaneously imposed the very serious administrative sanction of suspending each plaintiff's Medicaid and other state government program payments until a pending investigation is completed, which will likely not occur for months, if not years. Such actions deprive each plaintiff (and their employees) of their "liberty" without due process of the law. Moreover, the withholding of the plaintiffs' payments for past services, without affording plaintiffs notice and an opportunity to be heard, also deprives plaintiffs of their property without

due process further violating their civil rights.

## THE PARTIES

4.  Each plaintiff is duly licensed to provide mental health services to clients, patients, and residents in New Mexico, and each is, and has been for years, duly certified by the State Department as a provider of Medicaid services, as well as a provider of services to persons covered by certain other government programs, including "State Coverage Insurance" and "Behavioral Health Collaborative" services.

5.  Defendant Squier is the Chief Executive Officer of the State Department, the single state Medicaid agency charged under the federal law with administering New Mexico's Medicaid program. Medicaid is the federal/state health care program for the poor. 42 U.S.C. §§ 1396, *et seq.* and 42 C.F.R. §§ 430.1, *et seq.* The United States Department of Health and Human Services administers the program at the federal level through the Centers for Medicaid and Medicare Services ("CMS").

## THE APPLICABLE FEDERAL MEDICAID LAW

6.  As indicated above, the Medicaid program is the federal/state health insurance program for the poor. Federal Medicaid statutes and regulations are supreme to state statutes and regulations with respect to the administration of the Medicaid program. As a result, state Medicaid agencies must comply with the controlling federal Medicaid statutes and regulations. Of course, in order to do so, a state Medicaid agency must also act consistently with the provisions of the United States Constitution, including the due process clause of the Fourteenth Amendment to the United States Constitution.

7. For many years, the federal Medicaid regulations have given state Medicaid agencies the discretion to withhold Medicaid payments from a provider of Medicaid services, in whole or in part, if the state Medicaid agency has reliable evidence of a need for such a withholding due to alleged fraud or willful misrepresentation. Under this regulation, 42 C.F.R. § 455.23, a state agency must send notice of the withholding of program payments within five days of taking such action. All withholding of payments under this provision are required to be temporary.

8. As part of the Patient Protection and Affordable Care Act (P.L. 111-148), Congress amended the Medicaid laws to provide that federal financial participation in the Medicaid program shall not be made to a state Medicaid agency with respect to any amount expended for items or services furnished by an individual or entity to whom a state has failed to suspend payments during any period when there is a pending investigation of a credible allegation of fraud against the individual or entity. In February 2011, CMS, the federal agency responsible for administering the federal portion of the Medicaid program on a day-by-day basis, revised Section 455.23 to comport with these new provisions. Thus, now under Section 455.23, state Medicaid agencies "must suspend" all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud for which an investigation is pending unless the agency has good cause not to suspend payments or to suspend payment only in part. A credible allegation of fraud may be an allegation which has been verified by the state from any source, including but not limited to, "claims data mining" and patterns identified through provider audits. 42 C.F.R. Section 455.2. Amended Medicaid regulations also allow State Medicaid agencies to contract with private companies to perform Medicaid audits of past payments to

providers. 42 C.F.R. Sections 455.500 et seq. However, these same regulations require that providers be given appeal rights regarding the private contractor's audit findings. 42 C.F.R. Section 455.512. As discussed below, no appeal rights are being given the providers here regarding the private contractor's audit findings.

9. A Deputy General Counsel for the State Department, Larry Heyeck, has authored an article discussing this amendment to the regulation entitled *"Payment Holds Due to Credible Allegations of Fraud"*. A copy of the article is attached hereto as Exhibit "A". In this article, Mr. Heyeck states the position of the State Department here that any administrative review of a payment suspension action under Section 455.23 is limited only to determining whether "good cause" exists for terminating a suspension of payment, which has nothing to do with the underlying investigation or the underlying allegations of wrongdoing. The good cause grounds are basically designed to assist the State and to try to assure access to patients, residents and clients who will have their care disrupted if a sanctioned provider stops furnishing care to them. *See* Heyeck article, at pp. 4-5 and 8. In this same article, Mr. Heyeck acknowledges that the imposition of a payment suspension sanction will adversely impact Medicaid providers, including forcing some providers to shut down or seek the protection of a federal bankruptcy court. Heyeck article at p. 9. Mr. Heyeck also opines in his article that the only appeal rights required to be given to sanctioned providers are those relating to issues of access of care. He further states that no appeal rights are required regarding the allegations of fraud or abuse. Heyeck article at p. 5.

## THE FACTS

10. On June 24, 2013, representatives of the State Department, including Ms. Squier

5

and Mr. Heyeck, held a meeting with representatives from fifteen different Medicaid providers, including representatives from each of the plaintiffs, to inform them for the very first time that the State Department had purportedly determined there is a credible allegation of fraud involving each of the fifteen organizations for which a law enforcement investigation is pending. At this same meeting, the State Department representatives hand delivered to each of the plaintiffs and the other organizations letters dated June 24, 2013 (a typical copy of which is attached hereto as Exhibit "B"), informing each organization that as a result of the credible allegation of fraud and the pending law enforcement investigation the State Department was suspending all of their Medicaid and other State programs' payments immediately. According to the June 24 letters, this action was being taken pursuant to the requirements of the Federal Medicaid regulation, 42 C.F.R. § 455.23(a)(1).

11. The June 24, 2013, letter describes the payment suspension as "temporary," explaining that it will be in effect only until the prosecuting authorities determine that there is insufficient evidence of fraud, or alleged fraud, or willful misrepresentation by the provider or legal proceedings relating to the alleged fraud or willful misrepresentation are completed.

12. The June 24 letter (Exhibit B) indicates that the State Department received an allegation of suspicious activity from some unidentified source relating to the services provided and/or the claims submitted by each organization. The State Department also refers to the "preliminary investigation" conducted by an outside private contractor, Public Consulting Group, Inc. ("PCG"). This preliminary investigation, *i.e.* audit, purportedly yielded sufficient information to warrant the referral by the State Department to the Medicaid Fraud Control Unit of the New Mexico Attorney General's office for a full investigation of all 15 providers, which is

6

to be conducted by the Attorney General's office. According to the letter, all inquiries regarding any allegations of fraud or willful misrepresentation must therefore now be directed to the Attorney General's office.

13. In this same June 24, 2013, letter, the State Department indicates it is prohibited from disclosing the specific nature of the allegations due to the pending investigation. However, as a general matter, the State Department indicates the allegations covering the past three years of services include inappropriate use of billing codes, unbundling of professional services, and the possible use of deception to obtain an unauthorized benefit from the government health care programs. The only appeal right indicated in the letter is the right to request "good cause" to release the payment suspension in whole or in part due to certain factors, such as a potential adverse impact on access to care caused by the payment suspension. The good cause application process does not allow for any challenge to the underlying allegations.

14. Each of the plaintiffs has submitted good cause letters to the State Department requesting the release of the payment suspension sanction. However, as of the time of filing of this Complaint, these requests have either not been acted upon or granted only in part but in a manner which still leaves the plaintiffs aggrieved.

15. At the same June 24, 2013, meeting, the State Department made available for the very first time to each plaintiff a copy of June 24, 2013, "audit summaries" reflecting the apparent "audit findings" regarding the fifteen organizations against whom the payment suspension sanction was being imposed. According to this report, copy attached as Exhibit "C," page 2, for the past five months, the fifteen organizations had been subject to "the most rigorous behavioral health audit in state history." According to this same document, the audit results

indicate that each of the fifteen providers failed to meet minimal compliance standards resulting in the an estimated overpayment of approximately $36 million. Exhibit "C", p. 2. The audit summaries list examples of the findings without identifying which alleged findings pertain to which of the fifteen organizations. According to the same report, the examples reflect "mismanagement, fraud, waste and abuse affecting real lives." Exhibit "C", p. 4.

16. At the same June 24, 2013, meeting, the State Department also provided each of the fifteen organizations with an "Executive Summary" of the behavioral health provider audits at issue. A copy is attached as Exhibit "D". The Executive Summary indicates that the audit had been performed by PCG, the private outside contractor, beginning in February 2013. The Executive Summary also does not identify which alleged deficiencies/audit findings pertain to which organizations.

17. PCG is the same private contractor hired by the State of North Carolina to perform a similar audit of Medicaid providers in the State of North Carolina. North Carolina paid PCG for its services based on a percentage of the overpayments found by PCG during the audit. In other words, the greater the overpayment amounts determined to be owing by providers, the greater the compensation to PCG. In July 2012, the office of the State Auditor of the State of North Carolina released a report which criticized this state expenditure and the accuracy of the findings of PCG with respect to the audit of North Carolina Medicaid providers. According to this state audit report, (Exhibit E) "recoupments identified by PCG have not proven to be reliable." Exhibit "E", p. 8. In a May 17, 2013 media posting (Exhibit F), a North Carolina television station reports that North Carolina may not renew PCG's audit contract because of the errors committed by PCG in auditing North Carolina healthcare providers. The plaintiffs are

informed and believe and therefore allege that PCG has made the same types of audit errors here in order to maximize their compensation or other recognitions under its contract with the State Department in New Mexico. However, here, unlike in North Carolina, the State Department has blindly accepted PCG's audit findings, and has in fact provided the media with copies of them as explained further below. As the same time, the State Department refuses to disclose to each organization the specific audit findings relating to each provider organization.

18. Shortly after the June 24 meeting, defendant Squier commenced an intensive media campaign publicizing the results of the audits and the sanctions imposed on the fifteen organizations, including the plaintiffs here. Defendant Squier publicly accused the fifteen organizations of engaging in fraud and abuse and other wrongful conduct in the print and television media. Significantly, the State Department made available to the media, including the *Albuquerque Journal*, the identities of the fifteen providers. Thus, in an article published in the *Albuquerque Journal* on June 26, 2013 (Exhibit G), the *Albuquerque Journal* disclosed the identities of each of the fifteen organizations, including each of the plaintiffs here. The newspaper article and the other media reports have lumped together the fifteen organizations accusing all of them of fraud and abuse. The State Department also provided the media with copies of the audit summaries and the Executive Summary (Exhibits "C" and "D"). The media then proceeded to disclose and report to the public the allegations of fraud and abuse contained therein.

19. The State Department has refused to provide, and has no procedure for providing, any of the plaintiffs any name-clearing hearing regarding the allegations of fraud and abuse. It also refuses to provide the administrative appeal process ordinarily available to challenge

Medicaid overpayments to the fifteen organizations here with respect to the suspension sanction and the allegations contained therein. Therefore, unless and until the investigations are completed, neither the State Department nor any other government agency will provide the fifteen organizations, including the plaintiffs here, with any meaningful opportunity to clear their name. Indeed, the State Department will not even provide the individual organizations with the audit findings relating to each organization until the investigation by the Attorney General's office is completed. At the same time, the State Department continues to enforce the payment suspension sanction against each plaintiff. In fact, as of the filing of this complaint, the State Department has withheld hundreds of thousands of dollars of payments owing to plaintiffs for past services rendered.

### THE IMPORTANCE OF A PROVIDER'S REPUTATION FOR HONESTY

20. In the health care industry, the reputation of an organizational provider of health care services, including its lay and professional employees and contractors, is extremely important because of the sensitive nature of the relationship among the patients (clients and residents), their families and their care providers. This is especially true in the behavioral health field. Simply put, a provider's reputation for honesty and integrity is critical to its continuing viability. Allegations of fraud and abuse and other related wrongdoing will necessarily destroy the organization's reputation. This is true not only of the organization itself, but of each and every member within the organization who is involved in furnishing services to patients (residents and clients) and who is involved in the administration of such organizations, including those persons involved in the billing process.

21. Accusations of wrongdoing by federal and state government agencies are

especially damaging because other health insurance payors, including private third-party payors, and other healthcare organizations, including preferred provider organizations, often inquire about the status of a provider's relationship with the government when determining whether to contract with or continue to contract with a provider for nongovernment patient healthcare services. Such accusations can also be used as a basis for taking action against a health care professional's license.

22. Routinely, third-party payors, both government and private payors, inquire regarding the status of a provider's Medicaid participation in order to determine whether to continue to do business with the provider. Where, as here, a sanction has been imposed by a state agency, the sanction will have to be disclosed and adverse consequences will necessarily follow. The media's publication of alleged fraud and abuse and other wrongdoing by a provider may have even more dire consequences. The only possible way to lessen or mitigate such circumstances is for the health care provider to be able to address the allegations as promptly as possible. Delayed name clearing hearings are often too little, too late.

## THE DENIAL OF DUE PROCESS

23. Under the due process clause of the United States Constitution, a state government may not deprive a person of life, liberty or property without due process of the law. Included in the liberty interests to be protected by the Fourteenth Amendment is the right to one's good name and reputation. In short, a state may not impugn the good name, reputation, honor or integrity of a person without giving the person an opportunity to clear his or her name. Here, the payment suspension sanction together with the publication of the allegations of fraud and abuse impact directly on the reputation for honesty of each organization and each

organization's employees, especially those persons involved in furnishing services and those persons involved in billing Medicaid and other government payors for such services.

24.     Defendants and each of them dispute the accuracy of the allegations at issue and strongly dispute that it or its employees engaged in any fraud or abuse or similar wrongdoing. There has been a public disclosure of the allegations through the media, which was caused by the State Department's improper disclosure of the identity of the plaintiffs and the release of the undifferentiated audit findings. The allegations, which are false, are made in connection with the application of a serious sanction, the payment suspensions.

25.     Under the due process clause, the State Department has been under a continuing obligation to promptly furnish each defendant with adequate notice of the allegations of wrongdoing and to furnish each defendant with a prompt opportunity to be heard so that each plaintiff can clear its name. The failure to do so deprives each plaintiff of its civil rights. In short, each plaintiff should have been given a trial-type, name-clearing hearing well before any allegation of wrongdoing was made public.

26.     Additionally, the State Department is obligated to provide each plaintiff with adequate notice of the specific allegations of fraud and abuse and to give each plaintiff some process for challenging the withholding of payments in order to satisfy due process of the law. The payments being withheld for past services constitute plaintiffs' property.

## THE IRREPARABLE HARM

27.     The imposition of the payment suspension sanction together with the disclosure to the public of the allegations of fraud and abuse and other wrongdoing have caused and continue to cause each plaintiff, its employees, and its patients and their families irreparable harm. The

damage to each plaintiff's reputation and the injury caused by the payment suspension are substantial and irreparable, because they cannot be remedied on an after-the-fact basis through a hearing provided months or years from now. The irreparable harm is not only to each organization but to its employees and patients due to the harm caused to each organization's reputation and the harm caused to each organization caused by the termination of payment for services furnished. Within a short period time, each organization will likely have to begin laying off employees and cease servicing their Medicaid and other state government patients, clients and residents. If, as threatened, the State Department contracts with other providers to furnish services to the patients, residents and clients, there will be a substantial and potentially harmful disruption in the continuity of care and the treatment process for each patient, resident and client.

## THE LACK OF AN EFFECTIVE STATE OR OTHER FEDERAL REMEDY

28.     There is no appeal process that has been offered or furnished to the defendants in connection with the imposition of the payment suspension notwithstanding the fact that the controlling federal regulation requires state Medicaid agencies to furnish providers appeals to challenge a private contractor's audit findings. The fact that the State Department has reviewed applications to lift the payment suspensions for certain organizations does not provide an adequate appeal process with regard to the publication of the allegations of wrongdoing. The harm to each organization's reputation continues notwithstanding the good cause appeal process.

## PRAYER

WHEREFORE, plaintiffs pray as follows:

1. For an order temporarily and permanently enjoining the State Department from continuing to impose the payment suspension and continuing to publicize the payment suspension and the allegations of wrongdoing until and unless each plaintiff is furnished a meaningful name-clearing hearing, as required by the due process clause of the Constitution;

2. For costs of suit, including reasonable attorneys fees under 42 U.S.C. § 1988; and

3. For such other and further relief as the Courts deems to be just and appropriate.

Respectfully submitted,

By: /s/ W. Mark Mowery
W. MARK MOWERY (State Bar No. 1882)
Email: mmowery@rodey.com
RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
119 East Marcy Street, Suite 200
Santa Fe, New Mexico 87501
Telephone: (505) 954-3907
Facsimile: (505) 954-3942
Attorneys for Plaintiffs


HOOPER, LUNDY & BOOKMAN, P.C.
PATRIC HOOPER (State Bar No. 57343)
E-Mail: phooper@health-law.com
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
Telephone: (310) 551 8111
Facsimile: (310) 551 8181