# Exhibit D



State of New Mexico
Behavioral Health Provider Audits
*Executive Summary*

# EXECUTIVE SUMMARY

In February 2013, the New Mexico Human Services Department (HSD) contracted with Public Consulting Group, Inc. (PCG) to audit fifteen (15) mental health and substance abuse providers statewide. In 2012, these providers constituted approximately 87% of all Core Service Agency (CSA) spending for Medicaid and non-Medicaid behavioral health services[1]. PCG's audit consisted of three main components:

1) *Clinical Case File Audit* – a review of case file documentation, including staffing qualifications and credentials;
2) *IT/Billing Systems Audit* – a review of the billing system itself, as well as the protocols and processes employed by the provider; and,
3) *Enterprise Audit* – a review of the organization and its key stakeholders, third party contracts, and other stakeholder relationships.

Utilizing an approach developed and refined through auditing behavioral health providers nationally and tailored to New Mexico's payment rules and regulations, PCG's multi-faceted audit arrived at the following findings:

1) *Clinical Findings*: Identified more than $36.0 million in overpayments to these 15 providers over a three-year period from 2009-2012. This amounts to nearly 15% of all payments made to these providers. A 2003 Congressional General Accounting Office (GAO) report stated that Medicaid fraud, waste, and abuse is expected to be 3% to 9% of all payments. PCG recommends the collection of these overpayments.
2) *IT/Billing System Findings*: No material findings, though PCG did identify weaknesses in provider billing processes, including lack of audit trails when it comes to changes made in systems. Generally, PCG recommends that providers tighten billing process controls.
3) *Enterprise Findings*: Identified potential conflicts of interests of some individuals and some of the audited providers. PCG recommends that the State of New Mexico further review instances of potential conflicts of interest.

---

[1] Core Service Agencies, or CSAs, are provider organizations that have been designated by the New Mexico Behavioral Health Collaborative to be responsible for clinical coordination of care for children and adults. PCG's audit included 12 of the state's 15 CSAs. Estimated percentage of CSA spending utilized 2009-2012 total spending for each CSA.



**State of New Mexico**
**Behavioral Health Provider Audits**
*Executive Summary*

*Summary of Clinical Audit*

PCG's clinical case file review utilized two different methodologies for each provider:

1) **Random sampling of provider claims** – Audit of 150 randomly sampled claims that were submitted by the providers. The sampling methodology allows for a statistically valid extrapolation of the findings.

2) **Consumer case file review** – A review of a full year's worth of case file documentation for selected consumers. These findings are not extrapolated, but can be used to identify deficiencies that cannot be identified when viewing a single claim.

PCGs clinical case file review revealed moderate to significant levels of non-compliance with state payment rules and regulations. Generally, the providers reviewed in this audit lack many of the appropriate safeguards against overbilling and would benefit from targeted technical assistance. Additionally, PCG's findings reveal deficiencies in accuracy of clinical documentation, which signifies potential quality of care concerns that should be further reviewed by the State of New Mexico.

PCG utilized an audit tool developed and refined through auditing behavioral health providers nationally and tailored to New Mexico's payment rules and regulations. For the randomly sampled claims PCG utilized a statistically significant extrapolation methodology to identify more than $33.8 million in overpayments to these 15 providers over a three-year period from 2009-2012. With the consumer case file, or "longitudinal," reviews PCG identified an additional $2.1 million in overpayments to these 15 providers over the same three year period, for total estimated overpayments of $36.0 million (nearly 15% of claims paid during this period). Below are non-compliance rates and extrapolated overpayments by provider:



**State of New Mexico**
**Behavioral Health Provider Audits**
*Executive Summary*

| Provider | Randomly Sampled Claims % Non-Compliance | Randomly Sampled Claims Extrapolation - Lower Bound | Longitudinal Claims % Claims Failed | Longitudinal Claims $Value Claims Failed | Total Overpayment Amounts |
|---|---|---|---|---|---|
| Provider A | 29.3% | $ 2,046,690.0 | 64.8% | $ 179,903 | $2,226,593 |
| Provider B | 35.3% | $ 2,757,585.0 | 84.6% | $ 210,548 | $2,968,133 |
| Provider C | 13.3% | $ 772,016.0 | 27.8% | $ 78,854 | $850,870 |
| Provider D | 14.9% | $ 565,309.0 | 35.5% | $ 291,436 | $856,745 |
| Provider E | 21.8% | $ 3,629,976.0 | 70.7% | $ 103,063 | $3,733,039 |
| Provider F | 6.0% | $ 57,614.0 | 97.4% | $ 22,736 | $80,350 |
| Provider G | 55.3% | $ 3,138,735.0 | 38.2% | $ 55,521 | $3,194,256 |
| Provider H | 27.3% | $ 4,327,784.0 | 59.6% | $ 161,843 | $4,489,627 |
| Provider I | 3.3% | $ 7,856.0 | 41.1% | $ 14,018 | $21,874 |
| Provider J | 36.7% | $ 1,304,140.0 | 34.8% | $ 44,239 | $1,348,379 |
| Provider K | 15.3% | $ 1,028,069.0 | 98.6% | $ 437,537 | $1,465,606 |
| Provider L | 21.1% | $ 9,262,711.0 | 60.2% | $ 335,833 | $9,598,544 |
| Provider M | 17.3% | $ 612,663.0 | 20.0% | $ 43,137 | $655,800 |
| Provider N | 40.0% | $ 4,128,958.0 | 49.7% | $ 64,907 | $4,193,865 |
| Provider O | 18.0% | $ 228,309.0 | 97.1% | $ 68,661 | $296,970 |
| **Grand Total** | **23.7%** | **$33,868,415** | **57.1%** | **$2,112,234** | **$35,980,649** |

It is important to note that only the more egregious errors were used to extrapolate the amounts owed across the universe of claims for these providers. A more strict review of the randomly sampled provider claims originally indicated a non-compliance rate of 74%. PCG classified a number of these findings as "poor documentation practices" that should be remedied through a combination of trainings, technical assistance, and clinical and management assistance. These errors included missing signatures, inadequate case note completion, and below standard preparation of plans of care. Had PCG used these errors in the extrapolation, the resulting overpayment amounts would have been much greater.

PCG considers the extent of its findings to be a significant concern for the State of New Mexico. In a 2003 report[2], the Congressional General Accounting Office (GAO) estimated that fraud, waste, and abuse amounted to between 3% and 9% of total Medicaid spending. Using this GAO study as a base, this audit reveals overpayments that are double what can be expected.

---

[2] General Accounting Office, "Major Management Challenges and Program Risks:Department of Health and Human Services." 2003. http://www.gao.gov/assets/240/237027.pdf



State of New Mexico
Behavioral Health Provider Audits
*Executive Summary*

*Summary of IT/Billing Systems Audit*

PCG did not identify any specific instances of tampering with the providers' billing systems. This finding must be qualified for several reasons. First, PCG was unable to complete a comprehensive review of all billing systems as one of the billing systems vendors, Anasazi, prohibited providers from sharing system manuals, as they were considered proprietary (noted in an email that PCG viewed from Anasazi to one of the audited providers). Additionally, PCG identified areas of weaknesses in provider practices, including:

- Lack of audit trail for the creation of and changes made to claim records in provider billing systems;

- Lack of audit trail for any changes made to the 837 reports (billing system outputs) prior to finalizing in the Automated Clearing House portal.

*Summary of Enterprise Audit*

Lastly, PCG's enterprise audit sought to a) provide the state with a clearer view of how its provider system is organized and b) identify any potential appearances of conflicts of interest for the organization and its key board members and employees. The enterprise audit revealed that some providers may have potential conflicts of interest that should be further reviewed by the State of New Mexico. Examples of the types of potential conflicts of interest and areas that PCG recommends further research include:

- Unusual compensation and/or benefits to some key stakeholders;

- Key stakeholders' relationships with related parties with financial interests in transactions;

- Some arrangements with third parties are unclear as to the level of effort and compensation for some executives; and,

- Non-disclosure of all third party contracts.

*Scorecard and Risk Tier Results*

Based on the clinical case file compliance outcomes and findings related to IT controls, PCG developed, in conjunction with HSD, a "scorecard" for each provider. Below, PCG has

4



**State of New Mexico**
**Behavioral Health Provider Audits**
*Executive Summary*

organized the providers' scorecard results in relation to each other. The scorecard ranges from "Significant Non-Compliance" to "Compliant."



PCG then used these provider scorecard ratings to categorize providers into "Risk Tiers," replete with recommended state actions, as follows:

| Tier | Types of Findings | Recommended State Actions |
|---|---|---|
| 1 | Findings that include missing documents, etc. | • Provide trainings and clinical assistance as needed. |
| 2 | Significant volume of findings that include missing documents | • Provide trainings and clinical assistance as needed.<br>• Potentially embed clinical management to improve processes. |
| 3 | Significant findings, including significant quality of care findings. | • Provide trainings and clinical assistance as needed.<br>• Potentially embed clinical management to improve processes.<br>• Potential change in management. |
| 4 | Credible Allegation of Fraud | • Mandatory change in management. |



**State of New Mexico**
**Behavioral Health Provider Audits**
*Executive Summary*

Based on PCG's scorecard methodology, each of the 15 providers was categorized into a Risk Tier, the results of which are shown below.

| Tier | Recommended State Action | Provider |
|---|---|---|
| 1 | • Provide trainings and clinical assistance as needed. | |
| 2 | • Provide trainings and clinical assistance as needed.<br>• Potentially embed clinical management to improve processes. | M, C, I, D, J, L, H, and N |
| 3 | • Provide trainings and clinical assistance as needed.<br>• Potentially embed clinical management to improve processes. Potential change in management. | E, G, A, F, K, O and B |
| 4 | • Mandatory change in management. | See NOTE, below |

*NOTE:- Please note that Tier 4: Credible Allegation of Fraud is a determination that can only be made by the State of New Mexico. PCG utilized results from its clinical case file audit and IT/billing system audit to develop the scorecard, which translated into providers being categorized in Tiers 1, 2, and 3. The State of New Mexico may determine that information provided in the case file, IT/billing system, and enterprise audits constitutes a re-categorization of one or more providers into a higher risk tier, including Tier 4.*

**Background**

In February 2013, the New Mexico Human Services Department (HSD) determined the need for a comprehensive clinical and billing audit of select providers within its behavioral health system and engaged Public Consulting Group (PCG) to conduct these audits. Claims data mining by the state's behavioral health vendor revealed a significant number of potential billing abnormalities. These potential billing abnormalities included, but were not limited to, the following data and case file "findings:"



**State of New Mexico**
**Behavioral Health Provider Audits**
*Executive Summary*

- Cross billing at different locations for the same member potentially overlapping time; uncertainty as to who rendered the service (if rendered at all);
- Insufficient documentation;
- Cross billing multiple codes and double billing (e.g. individual and group therapy);
- Upcoding individual therapy (compared to the average time billed per code in the peer group);
- Excessive billing for psychosocial rehab; including requesting authorization for a consumer on medical leave;
- Suspicious high volume days per one code; overbilling for inappropriate codes; psychosocial rehabilitation billed for large units on a given date to one clinician; excessive hours per day billed by practitioner; excessive hours of service billed per patient per code; billing for services duplicative in nature;
- Identifying Provider as the rendering clinician;
- No medical necessity reviews to determine basis for long-term psychotherapy;
- Forging clinician records to incorporate more time than truly performed;
- Out of home placement services outside norm of service; doubtful medical need;
- Billing outpatient services the same day as bundled services.

Not all of the aforementioned potential billing issues can be addressed with a single audit, particularly when an objective of the audit is to identify recoupable overpayments. In order to recoup across a universe of paid claims, a more comprehensive review is required. Narrowly focusing on one particular suspicious trend in a provider's claims history inhibits the ability of the auditor and the state to extrapolate those results across the entire claims history. Rather than attempting to address each provider's uniquely identified issues, PCG worked with HSD to develop a comprehensive approach that would scrutinize individual providers *holistically* (as opposed to looking at a few aberrant trends that may or may not run afoul of policy even if substantiated) and the system at large. This approach was characterized by three main goals:

1) Identify potential credible allegations of fraudulent activity.
2) Identify regulatory compliance levels of behavioral health providers.
3) Identify areas of weakness that must be strengthened prior to the implementation of Centennial Care.

PCG was tasked with conducting onsite audits of selected providers to examine case files supporting specific claims, IT systems and processes, and adherence with compliance protocols, and to examine existing relationships, financial or other, among providers and other entities. The onsite audits were conducted in February and March and included interviews with relevant

7



**State of New Mexico**
**Behavioral Health Provider Audits**
*Executive Summary*

provider staff, collection of hard copy and electronic file documents related to the above mentioned areas, and examination and manual testing of IT systems. The onsite visits were supplemented by desk reviews of collected documentation at a location separate from the provider site.

## Key Findings

While each provider is unique with respect to clinical findings, PCG identified certain common themes across many of the 15 providers reviewed, which are described below. For each provider, a section is included in the appendix that shows the detailed clinical findings specific to that provider. PCG's findings include:

- **More than $36.0 million in overpayments** for these 15 providers over a three and a half year period (July 2009-January 2013). This extrapolated overpayment amounts to 15% of total payments from state sources to these providers during this time period.

- **Non-compliance with many New Mexico state rules and regulations.** Pervasive issues that PCG identified across providers include:

*Randomly Sampled Claims*

- o Community Support Workers lacked evidence of completion of the required training per the service definition.
- o Assessments (psychosocial/psychiatric evaluations) were not up to date (within last 12 months) to determine if the consumer continued to meet the need of the rendered service.
    - Incomplete critical information such as Five Axis diagnosis.
    - Substance abuse history was absent for most consumers with a dual-diagnosis of mental health and substance abuse.
- o Treatment plans were not up-to-date and individualized per consumer. Updated treatment plans are necessary to determine any changes to goals/objectives in addition to progress or lack of progress by the consumer. Without continuously updated treatment plans, it is impossible to determine if the treatment interventions still meet the behavioral health needs of the consumer.
    - Goals/Objectives were not measurable and did not document achievable target dates based on the consumer's needs.
    - Service specific clinical interventions used to reach goals/objectives were absent.



**State of New Mexico**
**Behavioral Health Provider Audits**
*Executive Summary*

- Discharge plans and estimated length of treatment were not documented for all consumers. Documented discharge plans were rarely individualized.
  - Consumer Documentation
    - Consents for medications rendered were absent.
    - Documentation frequently did not describe the clinical interventions, progress or lack of progress toward goals, and next steps in treatment.
    - Interventions in the progress notes did not always link to the consumer's treatment plan or support the program definition of the billed service.
    - Progress notes did not contain a start and stop time or a duration that would enable a determination as to whether the billed time was accurate.
    - Billed units did not match the units documented on the progress notes.
    - Intensive Outpatient Program progress notes did not contain the treatment modalities used as required in the service definition.
    - Documented evidence of the required treatment team was absent for most team services.

<u>Longitudinal File Review Findings</u>

  - Safety/Risk Assessments were not completed or updated for consumers who were assessed to have current or past suicidal ideations (SI), homicidal ideations (HI), self harm or domestic violence issues.
  - Treatment plans were not up-to-date and individualized per consumer.
    - Plans contained the same goals/objectives for more than 12 months.
    - Potential overutilization of services without documented justification of the service related to extensive length of stay.
  - Consumer Documentation
    - Documentation frequently did not describe the clinical interventions, progress or lack of progress toward goals, and next steps in treatment.
    - Progress notes did not contain a start and stop time or a duration that would enable a determination as to whether the billed time was accurate.
    - Billed units did not match the units documented on the progress notes.

- **Weaknesses identified in providers' billing processes.** PCG identified weaknesses in internal claims processes. PCG was unable to complete a comprehensive review of all billing

9



**State of New Mexico**
**Behavioral Health Provider Audits**
*Executive Summary*

---

systems as one particular billing software vendor was unwilling to allow providers to share with PCG important documentation and information about the system.

- **Potential conflicts of interest in selected providers.** PCG identified areas of potential conflicts of interest among some providers, individuals, and related parties. Examples of the types of potential conflicts of interest and areas that PCG recommends further research include:

    o  Unusual compensation and/or benefits to some key stakeholders;

    o  Key stakeholders' relationships with related parties with financial interests in transactions;

    o  Some arrangements with third parties are unclear as to the level of effort and compensation for some executives; and,

    o  Non-disclosure of all third party contracts.

## Key Recommendations

- **Standardize clinical documentation across providers.** In order to ensure that all critical behavioral health consumer information is gathered and properly documented, PCG recommends that standardized forms be used across all providers. The standardized forms at a minimum would include assessments, treatment plans, and progress notes (daily/weekly/logs).

- **Implement a comprehensive program integrity effort for behavioral health services.** PCG recommends this PI effort be written into MCO contracts and be implemented by the state for non-Medicaid programs. This means more than just post-payment auditing. Traditional "pay and chase" models should be supplemented by pre-payment measures and more proactive provider education, oversight and monitoring efforts to proactively prevent errors from occurring prior to payment.

- **Provide technical assistance** to providers in the areas of clinical best practices and billing processes and procedures.



**State of New Mexico
Behavioral Health Provider Audits**
*Executive Summary*

- **Review and revamp New Mexico's behavioral health provider billing rules and regulations.** Specifically, PCG recommends certain "best practices" that should be required information.

- **Enforce payment regulations.** Payment rules and regulations are developed for several reasons, the primary of which is to ensure that consumers receive high-quality care.

- **Maximize the utility of the editing capabilities of claims processing systems to prevent overpayments.** Where functionality is lacking or inadequate to sufficiently vet claims pre-submission to avoid inappropriate billing, providers should engage in discussions with their EMR vendors to identify and implement the requisite safeguards. Thorough training of billing staff on new or previously unused system functionality will further ensure proper front end billing.

- **Complete additional reviews of potential conflicts of interest.**

Beyond the recommendations mentioned above, PCG was asked to provide additional recommendations for the New Mexico behavioral health system, based on the firm's national experience working with behavioral health and other community based providers. PCG recommends the following:

- **Convene stakeholder (state, vendors, and providers) workgroups to develop Outcomes Measures.** Working together, stakeholders can define the particular outcomes that New Mexico chooses to pursue. With specific measures in hand, work can begin on collecting the relevant information and data points, which will spawn fruitful conversations about quality of care and reimbursement reform.

- **Enforce Behavioral Health Providers' important role in Health Care Reform.** A primary argument in favor of health care reform is its potential to achieve cost savings by focusing attention on the small percentage of the population that consumes the largest share of health care services. Better management of care for those individuals can concurrently yield improvements in quality and decreased costs for services. Particularly in the case of publicly funded programs, individuals with chronic illnesses often have a primary or secondary behavioral health diagnosis. Behavioral health providers must be front and center in conversations regarding proactive management of care for this population.



## OptumHealth New Mexico Referrals Executive Summary

**Situation Overview:**

Part of Optum's responsibility as stewards of New Mexico's behavioral health care dollars is to control fraud, waste and abuse. As part of this commitment, Optum has been making referrals of suspicious activity in the provider network to the State, as required by contract, since the contract inception in July 2009.

As part of its fraud, waste and abuse program, Optum conducted research and desk audits on all providers in the Optum network. Optum detected irregularities in the claims data, indicating potentially unusual activity. Optum reported these irregularities within the behavioral health system as a whole to the State in November 2012. The State then moved to conduct a comprehensive audit. The State of New Mexico then conducted formal audits of 15 providers beginning in February 2013. Optum has continued to conduct additional research and desk audits on the entire provider network as part of ongoing fraud, waste and abuse efforts. The following is a summary of items found in our research.

**Issues Specific to the 15 Providers Audited:**

- Practitioners billing long hours, providers billing long days for consumers
- Providers unbundling bundled (all-inclusive and/or per diem) services Violation of CMS NCCI
- Up-coding and double-billing – research has shown providers using excessive billing of specific codes, or billing for two services but only providing one
- Overuse of codes
- Research identified outliers for out of home placement services.
- Consumer research identified billing for a consumer at two providers in a business relationship on the same date of service.
- Cross-billing for mutually exclusive codes on the same day at same provider or at different providers for the same consumer.
- In the course of an audit being conducted by Optum at a provider site, it became apparent that the provider's electronic medical records system was connected to a separate provider's electronic medical records system. Optum found this suspicious because the providers do not have a disclosed business relationship.

We take our responsibility as stewards of New Mexico's behavioral health care dollars to control waste, fraud and abuse very seriously and will continue to be vigilant in uncovering it.