# Exhibit E



# STATE OF NORTH CAROLINA

### DEPARTMENT OF HEALTH AND HUMAN SERVICES

### DIVISION OF MEDICAL ASSISTANCE

### FINANCIAL RELATED AUDIT

### SELECTED CONTRACTS WITH VENDORS TO IDENTIFY IMPROPER PAYMENTS

#### JULY 2012

### OFFICE OF THE STATE AUDITOR

#### BETH A. WOOD, CPA

#### STATE AUDITOR

# Department of Health and Human Services

## Division of Medical Assistance

## Financial Related Audit

## Selected Contracts with Vendors to Identify Improper Payments

### July 2012

### Administrative Officers

**Albert Delia, Acting Secretary**

**Michael Watson, Acting Director, Division of Medical Assistance**



**STATE OF NORTH CAROLINA**
**𝕺ffice of the 𝕾tate 𝕬uditor**

**Beth A. Wood, CPA**
State Auditor

2 S. Salisbury Street
20601 Mail Service Center
Raleigh, NC  27699-0601
Telephone: (919) 807-7500
Fax: (919) 807-7647
Internet
http://www.ncauditor.net

## AUDITOR'S TRANSMITTAL

July 24, 2012

The Honorable Beverly Eaves Perdue, Governor
The General Assembly of North Carolina
Albert Delia, Acting Secretary, Department of Health and Human Services
Michael Watson, Acting Director, Division of Medical Assistance

This report presents the results of our financial related audit at the Department of Health and Human Services.  Our work was performed by authority of Article 5A of Chapter 147 of the *North Carolina General Statutes* and was conducted in accordance with the performance audit standards contained in *Government Auditing Standards*, issued by the Comptroller General of the United States.

The results of our audit disclosed deficiencies in internal control and/or instances of noncompliance or other matters that are considered reportable under *Government Auditing Standards*.  These items are described in the Audit Findings and Responses section of this report.

*North Carolina General Statutes* require the State Auditor to make audit reports available to the public.  Copies of audit reports issued by the Office of the State Auditor may be obtained through one of the options listed in the back of this report.

*Beth A. Wood*

Beth A. Wood, CPA
State Auditor

# TABLE OF CONTENTS

PAGE

BACKGROUND AND GENERAL OBJECTIVES ........................................................................ 1

SCOPE AND SPECIFIC OBJECTIVES ................................................................................... 3

METHODOLOGY ............................................................................................................. 5

RESULTS AND CONCLUSIONS .......................................................................................... 7

AUDIT FINDINGS AND RESPONSES ................................................................................. 11

ORDERING INFORMATION ............................................................................................. 21

## BACKGROUND AND GENERAL OBJECTIVES

### BACKGROUND

As authorized by Article 5A of Chapter 147 of the *North Carolina General Statutes*, we have conducted a financial related audit at the Department of Health and Human Services - Division of Medical Assistance on selected contracts for services to assist the Department in identifying improper payments. There were no special circumstances that caused us to conduct the audit, but rather it was performed as part of our effort to periodically examine and report on the financial practices of state agencies and institutions.

There are a number of federal laws that address Medicaid fraud and abuse; however, states are primarily responsible for policing their individual programs. North Carolina has programs to combat Medicaid provider and beneficiary fraud, waste and abuse. An increased emphasis was placed on Medicaid fraud prevention when the General Assembly passed Section 10.26 of *North Carolina Session Law* 2010-31, which authorized the Department to enter, "modify or extend existing contracts to achieve Medicaid fraud prevention savings in a timely manner."

Program Integrity, within the Department's Division of Medical Assistance, is charged with ensuring compliance, efficiency, and accountability with the Medicaid program by detecting and preventing fraud, waste, and abuse. It also works to prevent improper payments through tort recoveries, recoupments, and ongoing educations/trainings of providers and recipients. The Department has partnered with various contractors to assist in examining Medicaid activities for fraud, waste, and abuse.

The Division of Medical Assistance contracts with Health Management Systems, Inc. to assist with its third party recoveries. Federal regulations require Medicaid to be the "payor of last resort." This means that all third party insurance carriers, including Medicare and private health insurance carriers, must pay before Medicaid processes the claim. Providers must report any such payments from third parties on claims filed for Medicaid payment. Section 6035 of the Deficit Reduction Act of 2005 also enhanced states' ability to identify and recover third party payments by (1) clarifying the specific entities that are considered "third parties" and (2) requiring states to pass laws requiring health insurers to provide the State with eligibility and coverage information needed to identify potentially liable third parties.

The Department contracts with International Business Machines (IBM) Corporation and SAS Institute, Inc. (SAS) to assist with its review for Medicaid provider and beneficiary fraud, waste, and abuse. The Division of Medical Assistance sought to identify a vendor that was able to provide a user-friendly fraud and abuse technology solution that supports Medicaid program integrity practices, significantly increases the detection of fraud and abuse, and maximizes the potential for increased recoveries. The Division reviewed solutions provided by three vendors, which included presentations by both IBM and SAS. Division representatives selected the IBM software because it provided the most turn-key product to

## BACKGROUND AND GENERAL OBJECTIVES (CONCLUDED)

meet the immediate needs of the Division.  The Governor's Office, along with departmental officials, then worked with SAS officials on an additional agreement that would allow SAS to develop a product related to recipient fraud.

In addition, the Division of Medical Assistance contracts with Public Consulting Group, Inc. (PCG) to support Program Integrity's post-payment claims review initiatives.  This process includes a review of provider documentation to determine if services billed to Medicaid were clinically and administratively appropriate according to generally accepted standards of care, Medicaid coverage policies, and guidelines and procedures.

### GENERAL OBJECTIVES

The general objectives of this financial related audit included determining whether:

- Improvements are needed in internal control over selected fiscal matters.
- Financial resources in selected areas have been prudently managed.

Details about these objectives are provided in the *Scope and Specific Objectives* section of this report.

Management is responsible for establishing and maintaining effective internal control. Internal control is a process designed to provide reasonable assurance that relevant objectives are achieved.  Because of inherent limitations in internal control, errors or fraud may nevertheless occur and not be detected.  Also, projections of any evaluation of internal control to future periods are subject to the risk that conditions may change or compliance with policies and procedures may deteriorate.  Our audit does not provide a basis for rendering an opinion on internal control, and consequently, we have not issued such an opinion.

2

## SCOPE AND SPECIFIC OBJECTIVES

Our audit scope covered the period of July 1, 2010 through January 31, 2012 and included selected internal controls and financial management practices in the following organizational units:

Division of Medical Assistance

The Division of Medical Assistance is responsible for the management of the Medicaid and Children's Health Insurance Programs for the Department. The Division provides access to health care for eligible North Carolina residents through cost-effective purchasing of health care services and products. The Division is further broken down into nine sections or offices, with Program Integrity being one of those sections.

Division of Information Resource Management

The Division of Information Resource Management is responsible for providing leadership in the use of technology to meet business needs; to plan, develop and operate the automated systems for the Department; and to implement technical solutions that maximize resources. It provided assistance to the Division of Medical Assistance as it entered into contracts to maximize technology and statistical analysis to detect providers or recipients that might abuse the utilization of Medicaid services.

Program Integrity Section

The Division of Medical Assistance's Program Integrity Section identifies provider claims for review and assigns cases to an investigator, analyst, or to one of its contract partners. The operational process includes:

    a.  Receipt of fraud and abuse leads, complaints, and/or referrals.

    b.  Determination of a time period to review claims and pull a population of claims.

    c.  Establishment of a statistically valid claim review sample from the population of claims.

    d.  Conduct administrative and/or clinical audits or investigations.

    e.  Use of a federally approved software application to determine the sample size and an extrapolated overpayment amount.

    f.  Seek recoupment of the amount determined to be improper and an overpayment for those provider claims determined to be out of compliance.

## SCOPE AND SPECIFIC OBJECTIVES (CONCLUDED)

Our audit focused on the *Miscellaneous Contractual Services Expenditures* account. Specifically, our audit covered the Department's contracts with:

- International Business Machines Corporation (IBM)
- SAS Institute, Inc. (SAS)
- Public Consulting Group, Inc. (PCG)
- Health Management System, Inc. (HMS)

For the above listed contracts, the Department reported miscellaneous contractual services expenditures during our audit period of approximately $23 million.

We examined internal controls designed to ensure that the Department properly accounts for the expenditures, that purchases comply with state purchase and contract requirements, and that proper services were received prior to payment. In addition, we examined internal controls designed to ensure that the Department properly monitors the products and services received from its contractors to ensure the adequacy of performance and compliance with applicable laws and regulations.

We also evaluated whether the benefits derived from the contracts exceeded the contract costs.

4

# METHODOLOGY

To accomplish our audit objectives, we gained an understanding of internal control over matters described in the Scope and Specific Objectives section of this report below and evaluated the design of the internal control. We then performed further audit procedures consisting of tests of control effectiveness and/or substantive procedures that provide evidence about our audit objectives. Specifically, we performed procedures such as interviewing personnel, observing operations, reviewing policies, analyzing accounting records, and examining documentation supporting recorded transactions and balances. Whenever sampling was used, we applied a nonstatistical approach but chose sample sizes comparable to those that would have been determined statistically. As a result, we were able to project our results to the population but not quantify the sampling risk.

As a basis for evaluating internal control, we applied the internal control guidance contained in professional auditing standards. As discussed in the standards, internal control consists of five interrelated components, which are (1) control environment, (2) risk assessment, (3) control activities, (4) information and communication, and (5) monitoring.

We conducted this audit in accordance with generally accepted government auditing standards applicable to performance audits. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

[ This Page Left Blank Intentionally ]

## RESULTS AND CONCLUSIONS

As noted below, our audit disclosed deficiencies in internal control that are considered reportable under generally accepted government auditing standards for three contracts. These items are described in more detail in the *Audit Findings and Responses* section of this report. Management's responses are presented after each audit finding. We did not audit the responses, and accordingly, we express no opinion on them.

Other observations and conclusions about each contract considered in our audit are presented below:

### International Business Machines Corporation (IBM)

Our audit of the IBM contract disclosed reportable deficiencies in internal control. Other matters noted in our audit concerning the IBM contract are described below.

Based on the contract proposal, the expected annual return on investment for the contract was 900%[1]. In that IBM was paid $5,999,996, the expected total potential recoupment amount would be $53,999,964. As of January 2012, the potential recoupments from IBM related reviews totaled $770,067. The Department's Controller's Office indicates that $426,756 of the potential recoupments have actually been received by the Department. At this time, the cost to purchase the two systems exceeds recoupments received.

The Department believes the continued use of the systems has the potential to be a valuable tool to detect fraudulent provider activity in the Medicaid and Children's Health Insurance Programs.

### SAS Institute, Inc. (SAS)

Our audit of the SAS contract disclosed reportable deficiencies in internal control. Other matters noted in our audit concerning the SAS contract are described below.

The total cost paid to SAS was $2 million. At the time the contract was signed, the contract proposal estimated that it would save the Medicaid program at least $27 million annually and have a return on investment of 1250%. As of the date of our audit, no funds have been recovered and no actual fraudulent activity has been identified.

Department officials continue to state that this contract is a major step in providing the Department with high-tech analytics to examine Medicaid recipient data and has the potential to be a beneficial tool to combat recipient fraud within the Medicaid and State Health Insurance Programs.

---

[1] Proposed annual recoupment of $54 million less 10% payment to IBM ($5.4 million) / $5.4 million cost.

## RESULTS AND CONCLUSIONS (CONTINUED)

Public Consulting Group, Inc. (PCG)

Our audit of the PCG contract disclosed reportable deficiencies in internal control. Other matters noted in our audit concerning the PCG contract are described below.

The payment methodology for the PCG contract is based on contingency fees aligned with potential recoupment amounts identified. PCG was paid $3.2 million during our audit period.

A review of the Department's records indicated recoupments requested from cases identified through PCG's efforts totaled $38.5 million. Additional follow-up from the Department's Controller's Office indicated the Department had collected $3.7 million of the requested recoupments. However, recoupments identified by PCG have not proven to be reliable, so the actual benefit being derived from the contract is unclear.

Health Management System, Inc. (HMS)

Our audit of the HMS contract did not disclose reportable deficiencies in internal control. Other matters noted in our audit concerning the HMS contract are described below.

The Deficit Reduction Act of 2005 provided states with increased flexibility in making reforms to their Medicaid programs. A key provision included in the Act was the requirement that State legislatures require health insurers to provide the State with coverage and eligibility data needed by the State to identify potentially liable third parties. To address this federal requirement, *North Carolina General Statute* 108A-55.4 requires insurers to provide certain information to the Department. Our review of the statute identified wording sufficient to meet all the key provisions set forth in the Deficit Reduction Act. The statue indicates health insurers and pharmacy benefit managers regulated as third-party administrators shall provide information to determine the time period of an individual's coverage by a health insurer and the nature of the coverage. Also, these insurers are to accept the Department's right to recovery and the assignment of payment for services paid under the State Medical Assistance Plan.

The Division of Medical Assistance contracted with HMS to supplement the efforts of the Division's Third Party Recovery Branch and to maximize the outcome of third party liability initiatives. The contract requires HMS to provide a variety of services including the identification of entities that would be subject to third party liability recovery, automated data matching of Medicaid eligibility files searching for third party liabilities, uploading third party insurance policy information into the Medicaid Eligibility Information System, and payment recovery processes from providers and insurance companies. The contract requires that HMS perform data matching for active Medicaid and Health Choice recipients on a quarterly basis against the top ten medical and pharmacy insurance carriers specifically in North Carolina and within the surrounding states.

## RESULTS AND CONCLUSIONS (CONCLUDED)

During our audit period, HMS generated $157.9 million in total recoveries to the Department with payments due to HMS of $14.9 million. That represents a return of investment of 962%[2] without regard to federal participation amounts or cost avoidance projections. The recovery amounts substantially exceeded contractor payments.

---

[2] Total recoveries of $157,902,703 less total amount paid to HMS ($14,868,567) / $14,868,567 cost.

[ This Page Left Blank Intentionally ]

## AUDIT FINDINGS AND RESPONSES

*Government Auditing Standards* require that we add explanatory comments to the report whenever we disagree with an audit finding response. In accordance with this requirement and to ensure that the nature and seriousness of the findings are not minimized or misrepresented, we have provided comments to the Department's responses when appropriate.

1. DEFICIENCIES RELATED TO INTERNATIONAL BUSINESS MACHINES CORPORATION (IBM) CONTRACT

   Payments made to IBM under its contract with the Division of Medical Assistance were not based on actual deliverables, and the current return on investment has not reached the cost of the contract. The Department believes the contract may have long-term potential for cost savings.

   Description of Contract

   The Division contracted with IBM to purchase two analytic software solutions for the detection of fraudulent or abusive practices by health care providers. During our audit period, the Division entered into two contracts with IBM.

   The first contract had a not-to-exceed amount of $6 million and included the initial purchase and training for Division staff on the two software products, Fraud and Abuse Management System (FAMS) and InfoSphere Identity Insight. FAMS uses advanced analytics to detect potential healthcare fraud through peer group modeling and behavioral analysis. The InfoSphere software is used to analyze claims data for patients and providers to detect suspicious billing patterns. This contract ran through June 30, 2011. IBM projected that the State would recognize an annual return on investment of 900%[3] in potential recoupments based on identified improper claims. The second contract, in the amount of $1.66 million, pays for additional training and modules to support divisional efforts using FAMS and runs through August 2012.

   Deliverables and Payments

   Our review of the initial contract identified such deliverables as module implementation and user guides, development of custom reports, and training. These deliverables are consistent with the purchase and delivery of a software system. However, we noted that the payment terms of the contract did not correspond to the deliverables produced by IBM. Instead, IBM was paid monthly in amounts equal to 10% of the total monetary amount of the recoupment letters issued for that month, irrespective of whether the Division actually recouped the money requested or not. IBM was guaranteed a minimum payment of $1.5 million with a not-to-exceed amount of $6 million. The latter amount

---

[3] Proposed annual recoupment of $54 million less 10% payment to IBM ($5.4 million) / $5.4 million cost.

## AUDIT FINDINGS AND RESPONSES (CONTINUED)

was based on IBM's review of past claims and its expected return on investment from its review of claims.

As per the table that follows, IBM was actually paid $5,999,996* for the purchase of the two systems:

| Service Dates | Invoice Date | Contract Payment Amount | Total Potential Recoupments (A) | Potential IBM Related Recoupments (B) | Actual IBM Related Recoupments |
|---|---|---|---|---|---|
| **First IBM Contract** | | (A * 10%) | | | |
| Jul-10 | 8/6/2010 | $          170,241 | $        1,702,414 | $        105,269 | $         90,248 |
| Aug-10 | 9/9/2010 | 255,778 | 2,557,785 | 66,386 | 58,898 |
| Sep-10 | 10/12/2010 | 1,163,007 | 11,630,071 | | |
| Oct-10 | 11/10/2010 | 133,040 | 1,330,409 | 8,541 | 8,541 |
| Nov-10 | 12/8/2010 | 1,946,652 | 25,286,120 | | |
| Nov-10 | 12/8/2010 | 531,960 | | | |
| Nov-10 | 12/8/2010 | 50,000 | | | |
| Dec-10 | 1/24/2011 | 175,609 | 1,756,098 | 111,177 | 111,177 |
| Jan-11 | 2/16/2011 | 146,143 | 1,461,430 | | |
| Feb-11 | 3/14/2011 | 264,900 | 2,649,003 | | |
| Mar-11 | 4/4/2011 | 112,887 | 1,128,873 | 1,587 | 1,587 |
| Apr-11 | 5/10/2011 | 395,860 | 3,958,601 | | |
| May-11 | 6/8/2011 | 653,919 | 12,840,038 | | |
| Total First IBM Contract | | $        5,999,996 | * | | |
| **Second IBM Contract** | | | | | |
| Oct-11 | 11/29/2011 | $          138,500 | | 406,703 | 85,901 |
| Nov-11 | 11/29/2011 | 138,500 | | | |
| Dec-11 | 12/29/2011 | 138,500 | | 67,979 | 67,979 |
| Jan-12 | 1/23/2012 | 138,500 | | 2,425 | 2,425 |
| Total Second IBM Contract | | $          554,000 | | | |
| Totals | | $       6,553,996 | $      66,300,842 | $        770,067 | $       426,756 |

The payment methodology is concerning on two fronts - it was not tied to IBM deliverables established in the contract and it was based on gross recoupment values versus recoveries attributable to the use of the IBM software products.

We discussed the payment methodology with Division management. The Division selected this method to stagger the payments for the purchase of the systems over an extended duration of time rather than incur the total purchase costs at the time of acquisition. The logic given was that the state budget was unfavorable and this allowed the Division more flexibility in the payment schedule. However, the payment methodology could also have been tied to the delivery of products, services, and demonstrated results with similar spreading of payments over time. Prudent contracting practices would establish payment terms that align with contract deliverables, in this case, the successful implementation of the two purchased software products. Additionally, the methodology differs from other departmental purchases of software systems.

## AUDIT FINDINGS AND RESPONSES (CONTINUED)

As noted previously, IBM was reimbursed 10% of the total monthly potential recoupments until it reached the contract cap of $6 million. However, these total recoupments were identified through many different mechanisms that the Program Integrity section uses to review for fraudulent activity, not just the IBM system. As the table indicates in column B, recoupments derived solely from the IBM software during this start-up phase were actually minimal compared to the total potential amount.

<u>Return on Investment</u>

Based on the contract proposal, the expected annual return on investment for the contract was 900%. In that IBM was paid $5,999,996, the expected total potential recoupment amount would be $53,999,964. As of January 2012, the requested recoupments from IBM related reviews totaled $770,067. The Department's Controller's Office indicates $426,756 of the requested recoupments have actually been received by the Department. At this time, the cost to purchase the two systems exceeds recoupments received.

Subsequent to our review, the Department has announced that the use of the IBM software has resulted in the discovery of $6.2 million in potentially fraudulent payments and an additional $191 million in "unusual" Medicaid billings. However, those amounts will require additional time and effort to pursue, resolve, and recoup. The Department believes that the continued use of the systems has the potential to be a valuable tool for detecting fraudulent provider activity in the Medicaid and Children's Health Insurance Programs.

*Recommendation*: The Division should evaluate payment methodologies before entering into contracts to ensure payments correspond to established contract deliverables. In addition, any measurement of vendor performance should be tied directly to the outputs generated by that vendor. In measuring the results of the IBM contract, only recoupments related to the IBM software use should be considered when computing return on investment and in evaluting the performance of the vendor.

*Department Response*: The Department concurs with the audit finding and offers the following additional information. It is important to note that the Division actually owns the IBM FAMS product which will continue to be used in the future; therefore, while the IBM FAMS product did not produce a positive return on investment in the initial year it was implemented, all indications are that it will continue to produce benefits over the life of the product. As with most IT projects, a considerable amount of time is required initially for staff to become proficient in software use and to fine-tune the software and reports to meet the user's needs.

The FAMS product was pivotal in identifying issues with up to $191 million in unusual billing by over 200 outpatient mental health providers. Since the project started in late February 2011, over 75 providers have been investigated and more than 15 referrals have been made to the North Carolina Department of Justice's Office of the Medicaid Investigations Division (MID) due to credible allegations of fraud. Based on the MID

## AUDIT FINDINGS AND RESPONSES (CONTINUED)

recommendations, these providers will either be suspended or put on prepay claims review. While these referrals do not yet show a monetary value in terms of collections at this point, they generate cost avoidance and act as a deterrent to further aberrant billing practices.

More models continue to be collaboratively created by DMA PI staff and IBM staff. Currently, reports are being run and analyzed by DMA PI staff. In the future, there will be more investigations of other provider model types which will continue to identify vendor and recipient fraud, waste, and abuse in the Medicaid Program.

The current IBM contract, executed September 23, 2011 is a fixed price contract with specific deliverables and a timeline that must be met. These deliverables include:

- Configuration of Fraud and Abuse Detection Models
- Assistance in Evaluation of Qualitative Leads
- Staff Training and Assessment of Lessons Learned
- Development, Design and Training of the PI Analytics Team

IBM professionals assist DMA Program Integrity (PI) staff in developing and running models to mine for aberrant billing data of Medicaid providers and to conduct training sessions for DMA PI staff which are related to data mining and the use of FAMS. The FAMS product is the IT solution used for data mining and the information it yields is used to guide DMA PI in prioritizing and investigating Medicaid providers for fraud, waste and abuse.

All deliverables are up-to-date, with only three training sessions outstanding which will be provided no later than September 2012 in order for all deliverables to meet established guidelines.

*Auditor Comment*: The Department's response focuses on the potential benefits that may be received through future use of the IBM systems, though such benefits have been limited thus far. The Department should also take necessary measures to ensure that future contract performance is measured against appropriate established contract deliverables.

2.  DEFICIENCIES RELATED TO SAS INSTITUTE, INC. (SAS) CONTRACT

Payments made under a contract with SAS did not coincide with completion and acceptance of deliverables as specified in the contract, and the current return on investment has not reached the levels projected for the contract. The contract with SAS provides the Department with what it considers to be more sophisticated tools for the detection of Medicaid fraud that may have the long-term potential for cost savings.

## AUDIT FINDINGS AND RESPONSES (CONTINUED)

<u>Description of Contract</u>

The Department contracted with SAS to license the use of the SAS Fraud Framework for Government software to analyze Medicaid recipient data for indications of fraud or abuse. A contract was signed December 2010 for $2 million with the option to renew for two additional one-year contract periods at additional annualized costs.

The SAS software is designed to assist the Department in reviewing Medicaid participant eligibility. The intent is to use data analytics to cross-check and validate participant eligibility information at the earliest point in the process. That would allow the Department to investigate and prevent the enrollment of ineligible beneficiaries, thus reducing administrative costs and the "pay and chase" costs associated with invalid claims.

<u>Deliverables and Payments</u>

The contract outlines five phases, with estimated implementation deadlines, for bringing the SAS product to operational status. The payment structure was established to match key milestones, with $1 million due upon initiation of data review, $500,000 due at the time the peer grouping/anomaly detection phase was completed, with the final $500,000 due upon full operation of the system. Calendar dates were also assigned to those milestones.

Our review of the contract identified deficiencies in the Department's contract management procedures:

- SAS did not meet the milestones as identified in the contract schedule of work; however, they were paid the full amount of the contract based on date deadlines established in the contract. We noted that the Department received its first anomaly alert reports using live data in March 2012, though this phase was scheduled for completion in November 2011. Those reports were only for test counties and related to the completion of Phase III in the contract. The Department still had much work to do in reviewing and verifying the accuracy of the data.

- The contract was set up such that the Department was to approve and accept the deliverables established for completing each project phase. We noted that the Department received and made payment on invoices that did not support the accomplishment of agreed-upon deliverables as described in the contract. The Department's procurement and contract policies state, "Payment will not be made for any portion of the work that has not been satisfactorily completed. Upon approval and written authorization, a contractor may be granted an exception and receive advanced funds." The Department did not request written authorization to be granted an exception to pay the contract when the deliverables were not completed in a timely manner.

## AUDIT FINDINGS AND RESPONSES (CONTINUED)

- The Department maintained a tracking tool to assist in monitoring project status and completion efforts. However, the tool was not completed as designed which might have allowed for more effective project management by the Department.

<u>Return on Investment</u>

At the time the contract was signed, the SAS contract proposal estimated that it would annually save the Medicaid program at least $27 million and have a return on investment of 1250%. This was based on previous collaborative efforts with SAS and estimates of its proposed impact using North Carolina Medicaid data. As of the date of our audit, no funds have been recovered and no actual fraudulent activity has been identified.

Discussions with departmental staff indicated that the data sharing and development of peer group data was much more difficult than either party to the contract expected. Department staff indicated that the timelines have been delayed and/or extended to produce more effective results. Department officials continue to state that this contract is a major step in providing the Department with high-tech analytics to examine Medicaid recipient data and has the potential to be a beneficial tool to combat recipient fraud within the Medicaid and Children's Health Insurance Programs.

*Recommendation*: The Department should evaluate payment methodologies before entering into contracts to ensure payments correspond to established contract deliverables. If advance payments are required before the receipt of deliverables, the Department should ensure written authorization is given for the exception or formally amend the contract deadlines. In addition, any measurement of vendor performance should be tied directly to the outputs generated by that vendor.

*Department Response*: The Department concurs with the finding and offers the additional information. NC DHHS continues to work with the vendor on important software to prevent fraudulent or incorrect recipient enrollment in the Medicaid program. This shift from "pay and chase" to prevention will yield significant savings for the Medicaid program. Attempting to recoup Medicaid funds improperly claimed is expensive to pursue and often difficult to recoup. Thus, the Department is expanding its efforts to "prevent" fraud and/or abuse from occurring.

The vendor's efforts and results were closely monitored throughout the contract term. DHHS held bi-weekly meetings with the vendor to review progress and work collaboratively to determine how to best utilize data sources available for the data analytics effort. Project management of this initiative was handled using the appropriate project management methodology. Bi-weekly meetings were held between DHHS and the vendor to review formal documentation that included the following categories of information: project status, risks and challenges, action items, decisions made, high-level project timeline, data status, and high-level milestone and deliverable status.

**AUDIT FINDINGS AND RESPONSES** (CONTINUED)

The vendor produced initial production data anomaly reports prior to the end of 2011. The production of such reports was an iterative process from 2011 through the end of the contract term.   This involved DHHS review of report results, and vendor enhancement/modification of data analytics and reports based on DHHS feedback. It was agreed that the contract term would be extended at no additional cost for an additional three months (i.e., through March 19, 2012) to provide the vendor and DHHS additional time to validate reports and modify criteria for the reports as both parties' deemed necessary.

*Auditor Comment*:  The Department's response indicates that the vendor's efforts and results were closely monitored; however, there was no attempt to delay or withhold scheduled contract payments despite vendor slippage in providing contract deliverables or meeting established timelines.  Although the Department indicates that it received data anomaly reports prior to the end of 2011, the first usable reports were not received until March 2012.  Those reports only pertained to the pilot counties and did not provide statewide information.  The Department should maintain its focus on measuring contract performance against appropriate established contract deliverables.

3.   DEFICIENCIES RELATED TO PUBLIC CONSULTING GROUP, INC. (PCG) CONTRACT

The Division of Medical Assistance has not sufficiently monitored PCG's performance to ensure the quality of work performed.  As a result, questionable results have been achieved that were not detected by the Division in a timely manner.

Description of Contract

The Division contracted with PCG to support Program Integrity's efforts to conduct post payment reviews of selected Medicaid providers, including but not limited to behavioral health, medical, home and community-based services that have demonstrated abusive or aberrant billing problems.  Post payment reviews examine the clinical decisions made as to the medical appropriateness, duration, and intensity of services provided.  In addition, administrative decisions are reviewed as to compliance with clinical policy and the adequacy of documentation to support the billed services.   The reviews are to be conducted in accordance with audit/review tools and instructions provided by the Division, and the Division is supposed to monitor the quality of the reviews.

Deliverables and Payments

The payment methodology for the PCG contract is based on contingency fees aligned with identified recoupment amounts.  PCG was paid $3.2 million during our audit period.

Our review of contract results, as well as interviews of divisional staff, identified the following deficiencies in the Division's monitoring of the PCG contract:

17

## AUDIT FINDINGS AND RESPONSES (CONTINUED)

- The Division has not implemented consistent monitoring processes for evaluating contract results. The contract requires the Division to select a random sample of cases to assess the accuracy of the decisions and reliability of PCG. We noted that the Division's Program Integrity unit had not developed a formal monitoring plan that would allow for this assessment to occur. Differing sample sizes were selected by case types and no tracking list was maintained to identify those cases that were reviewed. As of January 2012, the Division had referred 692 cases, PCG had completed 242 cases, and approximately 20 cases have been reviewed by Program Integrity.

- The Division has not monitored the inter-rater reliability[4] by PCG staff. The contract states that PCG is to maintain an accuracy rate and inter-rater reliability confidence level of 95%. In addition, failure to meet the 95% requirement was to result in adjustments to contract payments to PCG. We did not find evidence where the Division performed reviews to document this contract requirement. It appears the Division relied on PCG's self-reporting of its accuracy rate based on internal quality assurance reviews.

- The Division provided Medicaid policy training to PCG staff prior to initiating reviews as required by the contract. This training was provided by Program Integrity and Clinical Policy staff. The Clinical Policy section is responsible for establishing medical policy and procedural guidelines that providers are required to follow. Due to the complexities of the Medicaid program, service providers are not consistent in completing documentation to support filed claims. Judgment is required to interpret the extent of errors and assess whether a provider recoupment is necessary or not. Based on Division management observations, it was noted that there were inconsistencies between Program Integrity and Clinical Policy staff in providing subsequent consultation to PCG. As a result of provider complaints and the performance of re-reviews, it became apparent to Division management that additional training was necessary. This was needed to ensure consistent implementation by PCG staff in policy interpretations provided by the Division. The Division has now implemented procedures where both sections have to sign-off on business requirements concerning new policies and interpretation provided to PCG.

During the course of our audit, we began receiving a number of complaints related to PCG's review activities. We chose to follow the Division's re-review procedures related to one of the complainants with two provider facilities. For those two provider facilities, we noted that the original tentative notice of overpayments totaled $1.34 million. As a result of the providers submitting additional documentation and re-reviews performed by Program Integrity, Clinical Policy, and PCG, the recoupment amount was revised downward to only $22,093. It was unclear whether this was the result of the additional documentation provided or PCG's policy interpretations during the review process.

---

[4] The degree of agreement and consistency among raters.

## AUDIT FINDINGS AND RESPONSES (CONTINUED)

Currently, the Division does not have a process to identify and track the reason for the difference.

As of January 2012, PCG sent 107 tentative notices of overpayments related to personal care services. Per our review of PCG emails to the Division, 78 providers (73%) have requested appeals related to PCG's review activities. It should be noted that the Division requested PCG to perform quality assurance reviews on all cases completed to date to determine if further re-review actions are necessary.

The deficiencies in the Division's monitoring of PCG's accuracy and inter-rater reliability rates failed to identify these issues in a timely manner. Given the complexity of responsibilities assumed by PCG, there was a significant risk that errors could occur in this process. As such, the Division's contract monitoring procedures should have been designed to address this risk.

Return on Investment

A review of the Division's records indicated recoupments requested from cases identified through PCG's efforts totaled $38.5 million. Additional follow-up from the Department's Controller's Office indicated the Department had collected $3.7 million of the requested recoupments. As described above, recoupments identified by PCG have not proven to be reliable, so the actual benefit being derived from the contract is unclear.

*Recommendation*: The Division should develop and implement proper procedures to evaluate the accuracy and effectiveness of reviews performed by PCG. The Division should also provide PCG with continuing training to increase the accuracy and effectiveness of reviews performed. Appropriate action should take place to address the results of the re-reviews performed for previously completed PCG reviews and develop a method to identify and track the reason for the errors. The Division should notify impacted providers of those corrective actions.

*Department Response*: The Department concurs with the audit report and offers the additional information. Working through the Division of Medical Assistance (DMA), the Department has developed a corrective action plan with PCG that began June 15, 2012. The plan requires PCG to expand its existing Quality Assurance (QA) Program to include hiring a QA supervisor, providing monthly reports to DMA, submitting a corrective action plan to DMA PI when errors are greater than 20%, creating a Hearings and Appeal Quality Improvement Plan and begin tracking the status of appeals and issues. The corrective action plan will require PCG to develop an operations manual and review guidelines for staff when auditing programs as well as when training staff.

It should also be noted that DMA PI has been performing quality assurance activities since spring 2012 for the review of PCG claims, thereby ensuring PCG audits are completed in accordance with Medicaid Policy. DMA PI will create a more formalized

## AUDIT FINDINGS AND RESPONSES (CONCLUDED)

process to evaluate the accuracy and effectiveness of reviews performed by PCG.  The anticipated date of completion for these procedures is September 30, 2012.

In addition, two items need to be mentioned in regard to recoupments.  First, there are substantial additional recovery amounts that are in the collection process/pipeline that will be collected.  Secondly, there are significant savings from cost avoidance associated with the PCG Post Payment reviews.  Many providers audited have either ceased to bill or reduced their billings upon notification they are being audited, thus preventing improper billings/payments.

## ORDERING INFORMATION

Audit reports issued by the Office of the State Auditor can be obtained from the web site at www.ncauditor.net. Also, parties may register on the web site to receive automatic email notification whenever reports of interest are issued. Otherwise, copies of audit reports may be obtained by contacting the:

> Office of the State Auditor
> State of North Carolina
> 2 South Salisbury Street
> 20601 Mail Service Center
> Raleigh, North Carolina 27699-0601
>
> Telephone:    919/807-7500
>
> Facsimile:    919/807-7647

---

This audit required 1,128 audit hours at an approximate cost of $81,216. The cost represents 0.35% of the $23 million of contract expenditures subjected to audit.

# Auditor: Fraud detection program savings fall short

Posted: July 26, 2012

Computer systems designed to detect waste and fraud in North Carolina's Medicaid system do not always produce the savings promised by their makers, according to a report by the state auditor released today

For example, the state paid SAS Institute $2 million with a promise that their fraud detection software would identify at least $27 million in savings.

"As of the date of our audit, no funds have been recovered and no actual fraudulent activity has been identified," the audit report reads.

One contract with the Public Consulting Group did identify $38.5 million that should be recovered in over-payments. However, only $3.7 million of that had actually been recouped, and the auditor said the program has "not proven to be reliable, so the actual benefit being derived from the contract is unclear."

Systems deployed by IBM also came in for criticism.

Beth Wood, the elected state auditor, said Medicaid officials should renegotiate the fraud detection contracts.

"If they didn't think they could ever get the 900 percent of 1,250 percent, then why are those terms in the contract? Why not renegotiate? Why not us get something back? Because they absolutely could not deliver," Wood said, adding, "When are you going to start holding their feet to the fire and getting what we paid for?"

In the past, officials with the Department of Health and Human Services have praised the efforts put forward under the programs and have told both auditors and lawmakers that they need to be patient with the progress.

"North Carolina is leading the nation in innovative, sophisticated analysis of Medicaid billing, which has already helped us identify hundreds of millions in potential over-payments," DHHS spokeswoman Chrissy Pearson said in an e-mail.

"These systems take time to implement, and after an intense start-up period, they are just beginning to show promise. DHHS has, in just two months, referred an unprecedented 35 cases to the Attorney General's office and found $191 million in questionable payments."

With regard to the SAS project, she said, their system didn't begin operations until the audit was concluded.



Sen. Stan Bingham, R-Davidson, is co-chairman of the Senate committee that oversees health spending. He said lawmakers have been repeatedly "disappointed" by the departments fraud detection efforts.

"It's probably the most serious problem we have," Bingham said.

Those missed targets contributed to $414.7 million in Medicaid shortfalls that the General Assembly had to fill this spring, he said.

Pearson says that's not so. Lawmakers, she said, set a target of $48 million in so-called "recoupments." The agency actually brought in more than $112 million.

Bingham said that the Legislature tried to be conservative in its estimates of the savings, but the actual savings to Medicaid have been below even those conservative projections.

"We need to look at numbers we realistically can depend on," Bingham said, adding that he and other lawmakers will be looking at this problem over the fall and winter.

Person said the auditor's report and lawmakers overlook the value of the fraud detection systems that goes beyond the money they return to the state.

"The auditor's report does not emphasize one crucial piece of information – the value of identifying fraudulent providers and stopping them from ever operating again," Pearson said. "Even if we don't recoup all the money lost, it's impossible to put a price tag on the deterrent effect of our efforts. We may never know just how many millions we will prevent from ever going out the door. This is the real value of the department's fraud prevention programs."

6/27/13                                   Auditor: Fraud detection program savings fall short - WRAL.com

Reporters: <u>Mark Binker</u>, <u>Cullen Browder</u>

*Copyright 2012 by Capitol Broadcasting Company. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

**Patric Hooper**

| | |
|---|---|
| **From:** | Garcia, Roque [rgarcia@rgbhs.org] |
| **Sent:** | Friday, June 28, 2013 2:01 PM |
| **To:** | Patric Hooper |
| **Subject:** | Fwd: RE: Minutes and Agenda |
| **Attachments:** | www.ncauditor.net_EPSWeb_Reports_FiscalControl_FCA-2012-4445.pdf; Auditor_ Fraud detection program savings fall short - WRAL.PDF |

This apparently the organization that did the aduit. Was found faulty in north carolina


---------- Forwarded message ----------
From: "Shannon Freedle" <shannon.freedle@teambuilders.org>
Date: Jun 28, 2013 1:24 PM
Subject: RE: Minutes and Agenda
To: "Marti Baca" <mabaca@salud.unm.edu>, <JennyMetzler@abqhch.org>, <TerriEllis@abqhch.org>, <VigMs@aol.com>, <khunt@bamhs.com>, <Marti.everitt@cai-nm.com>, <jfrietze@fyinm.org>, <eholland@gclcnm.org>, <narcher@hogaresinc.com>, <ctokarski@mhrnewmexico.com>, "Emmylou J. Emrick" <ejemrick@pathways-inc.net>, "Anne Martinez" <annem@piwnm.com>, <bill_belzner@pmsnet.org>, <Doug_Smith@pmsnet.org>, <rgarcia@rgbhs.org>, "Joe Harris" <jharris3@salud.unm.edu>, "Rodney McNease" <RMcNease@salud.unm.edu>, <smelby@smhc-nm.org>, <vpalmer@smhc-nm.org>, <ortega@snmhd.org>, <dbankson@socorromh.org>, <corrine.dominguez@state.nm.us>, <kdoss@swccnm.org>, <jrkerlin@tcc-nm.org>, <khamstra@tccsnm.org>, <sfreedle@teambuilders-counseling.org>, <carol@thelifelink.org>, <bchurch@tls-nm.org>, <Bob.Mansfield@uhsinc.com>
Cc: <JayCrowe@abqhch.org>, <jmarin@bamhs.com>, <kmoore@bamhs.com>, <djimenez@gclcnm.org>


Here is the article and the North Carolina HHS MAD report regarding program integrity audits there.




---------

**From:** Marti Baca [mailto:mabaca@salud.unm.edu]
**Sent:** Tuesday, June 25, 2013 1:40 PM
**To:** JennyMetzler@abqhch.org; TerriEllis@abqhch.org; VigMs@aol.com; khunt@bamhs.com; Marti.everitt@cai-nm.com; jfrietze@fyinm.org; eholland@gclcnm.org; narcher@hogaresinc.com; ctokarski@mhrnewmexico.com; 'Emmylou J. Emrick'; Anne Martinez; bill_belzner@PMSnet.org; Doug_Smith@PMSnet.org; rgarcia@rgbhs.org; Joe Harris; Rodney McNease; smelby@smhc-nm.org; vpalmer@smhc-nm.org; ortega@snmhd.org; dbankson@socorromh.org; corrine.dominguez@state.nm.us; kdoss@swccnm.org; jrkerlin@tcc-nm.org; khamstra@tccsnm.org; sfreedle@teambuilders-counseling.org; carol@thelifelink.org; bchurch@tls-nm.org; Bob.Mansfield@uhsinc.com
**Cc:** JayCrowe@abqhch.org; jmarin@bamhs.com; kmoore@bamhs.com; djimenez@gclcnm.org
**Subject:** Minutes and Agenda
**Importance:** High



Attached are the 6-7-13 minutes and the 6-28-13 agenda for your review.  Please let me know if there are any corrections.

The next scheduled meeting is on June 28 (replaces July 5 meeting due to holiday) at 1:00 PM via phone. Please try to attend.  Thank you.


Marti Baca
Administrative Assistant to
Rodney McNease, Exec. Director
Behavioral Health Finance
Behavioral Health Administration
2600 Marble, NE
Albuquerque, NM 87106
(505) 272-2070 office
(505) 272-2016 fax
mabaca@salud.unm.edu


IMPORTANT
This email is confidential, intended only for the named recipient(s) and may contain information that is privileged or exempt from disclosure under applicable law. If you are not the intended recipient, you are notified that dissemination, distribution or copying of this message is strictly prohibited. If you receive this message in error, or are not the named recipient, please notify the sender at the email address above and delete this email from your computer.