IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BORDER AREA MENTAL
HEALTH SERVICES, INC., *et al.*,

      Plaintiffs,

vs.

      Case No. 13-cv-00613 MCA/WPL

SIDONIE SQUIER, Secretary
of the Human Services Department
of the State of New Mexico,

      Defendant.

## **ORDER**

      This matter is before the Court upon Plaintiffs' *Motion for a Temporary Restraining Order* [Doc. 5]. The Court has considered the written submissions of the parties, the evidence and arguments of counsel presented at the July 17, 2013 hearing, the record in this case, and the applicable law, and is otherwise fully advised. For the reasons that follow, the Court denies Plaintiffs' motion.

**Background**

      This case is a civil rights action brought pursuant to 28 U.S.C. § 1343 (3) and (4)[1] arising

---

[1] 28 U.S.C. § 1343 is a jurisdictional statute; it does not create a cause of action. *Rose v. Utah*, 399 Fed. Appx. 430, 437 (10th Cir. 2010) (noting that § 1983 "requires not only that the technical requirements of jurisdiction be met but that suit against the parties named as defendants *be authorized under the cognate provisions of 42 U.S.C. § 1983*.") (quoting *Symm v. United States*, 439 U.S. 1105, 1108 (Rehnquist, J., dissenting from denial of certiorari) (emphasis added)). The Court will assume, in the absence of allegations expressly eschewing reliance on 42 U.S.C. § 1983, that Plaintiffs are relying on § 1983 for their federal causes of action.

out of the New Mexico Human Services Department's[2] suspension of payments to Plaintiffs, eight behavioral health services providers doing business as corporations. Each Plaintiff has contracted with HSD to provide services to eligible recipients of Medicaid[3] and other programs administered by HSD (an exemplar provider agreement is found in the record at Docket No. 26). Each agreement requires the provider to "[a]bide by all federal, state, and local laws, rules and regulations, including but not limited to, those laws, regulations, and rules applicable to providers of services under Title XIX (Medicaid) . . . ."

In late 2012, Optum Health New Mexico, Inc., a private entity employed by the State to manage the delivery of Medicaid and non-Medicaid behavioral services, advised HSD that a review of claims employing new software had determined that aberrant billing practices had occurred throughout Optum's network of providers. In February 2013, HSD selected an outside auditor, Public Consulting Group, Inc., to conduct an in-depth audit of fifteen providers of behavioral health services. Plaintiffs were among these fifteen providers. Together with the Behavioral Health Service Division of HSD, PCG developed a protocol to evaluate claims by these providers for irregularities. For each provider, PCG examined 150 randomly selected claims to insure a confidence level of 95%. In April 2012, PCG advised HSD that approximately 71% of the claims failed to satisfy the criteria used in the protocol. Thereafter, PCG and BHSD staff reprocessed the claims using "relaxed" (*i.e.*, more favorable to the providers) criteria.

On June 21, 2013, representatives of HSD and PCG met with members of the New

---

[2] Secretary Squier, rather than HSD, is the named Defendant. The Court understands Plaintiffs to be bringing this suit pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

[3] Plaintiffs' clients include recipients with homicidal and suicidal ideation, children in treatment foster care homes, and recipients dependant on psychotropic drugs.

Mexico Attorney General's Medicaid Fraud Control Unit and representatives from the United States Attorney's Office and the New Mexico Taxation and Revenue Department. At the meeting, PCG presented findings showing that all fifteen of the audited providers failed the audit. Based upon what it viewed as credible allegations of fraud,[4] HSD referred all fifteen providers to the MFCU. The MFCU accepted all fifteen referrals. The MFCU is currently investigating the allegations of fraudulent billing.

On June 24, 2013, the director of the BHSD and representatives of HSD and PCG met with representatives of the fifteen providers who were the subject of the audit and the subsequent referrals to the MFCU. At this meeting, the fifteen providers, including Plaintiffs, learned that HSD had found each of them to be the subject of credible allegations of fraud; that HSD had made referrals of those allegations to the MFCU; and that MFCU was investigating the allegations of fraudulent billing. HSD gave each of the providers copies of documents titled "Audit Summaries," and "Executive Summary," and a letter advising the individual provider that HSD had made a preliminary determination that there were credible allegations of fraud concerning that provider for which a law enforcement investigation was pending, and that pursuant to 42 C.F.R. 455.23(a)(1) HSD was suspending payment for services "effective

---

[4] Federal Medicaid regulations define "credible allegation of fraud" as follows:

A credible allegation of fraud may be an allegation, which has been verified by the State, from an source, including but not limited to the following:
    (1) Fraud hotline complaints.
    (2) Claims data mining.
    (3) Patterns identified through provider audits, civil false claims cases, and law enforcement investigations. Allegations are considered to be credible when they have indicia of reliability and the State Medicaid agency has reviewed all allegations, facts, and evidence carefully and acts judiciously on a case-by-case basis.   42 C.F.R. § 455.2.

immediately." The letters also informed the provider that the withhold is "temporary" and would be in effect until "(1) The prosecuting authorities determine that there is insufficient evidence of fraud or alleged fraud or willful misrepresentation by the provider; or (2) Legal proceedings related to the provider's alleged fraud or willful misrepresentation are completed." The letters explained that

> HSD received an allegation of suspicious activity related to the services provided and/or claims submitted by your provider organization. Accordingly, HSD retained the services of an outside contractor, Public Consulting Group, Inc. who conducted a preliminary investigation and presented to HSD sufficient information to warrant the referral for a full investigation by law enforcement officials. Consequently, HSD referred this case to the Medicaid Fraud Control Unit (MFCU) of the New Mexico Attorney General's Office (see 42 C.F.R. §455.23(d)). . . . HSD is prohibited from disclosing the specific nature of the allegations due to the pending investigation by MFCU. However, as a general matter, the allegation involves activities over the past three years involving inappropriate use of various CPR codes, unbundling of professional services, and the possible use of deception to obtain an unauthorized benefit from the Medicaid Collaborative and SCI programs.
>
> Pursuant to 42 C.F.R. §455.23(e) and (f), "Good cause" to release a check withhold in whole or in part may be determined at the discretion of HSD. HSD will consider a finding of "good cause" where:
> 1. MFCU requests the release of a check withhold or declines to pursue the case;
> 2. A release in whole or in part is in the best interest of the Medicaid program;
> 3. Other remedies more quickly or effectively protect Medicaid funds (ex. posting of a bond);
> 4. Recipient access to items or services would be jeopardized because (a) the provider is the sole source of services in the community, or (b) the provider serves a large number of recipients in an underserved area;
> 5. [only for consideration of a partial release] The allegation is solely related to a specific type of claim or a specific business unit of the provider; or

>    6. Written evidence submitted by the provider supports the release of a check withhold.
>
> You may request an administrative record review within 20 calendar days of receipt of this notice to request a partial or whole good cause exception to the check hold. Enclosed is a Good Cause Request Form to submit for consideration of a "good cause" exception to release the check withhold in whole or in part. The written request must include a copy of this letter and any supporting evidence of additional documentation for reconsideration by the agency.

Each plaintiff subsequently requested a "good cause" release of the suspensions. On Monday, July 15, 2013, each Plaintiff received a letter advising it that its request for a good cause release had been denied. Under New Mexico law no further administrative review of the payment suspensions is available. NMAC 8.353.2.10(C)(1)(c).

After the June 24 meeting, HSD publicly announced that it had suspended payments to fifteen providers. *The Albuquerque Journal* submitted a request to HSD pursuant to the New Mexico Inspection of Public Records Act, NMSA 1978, §§ 14-2-1, *et seq*., seeking the names of the fifteen providers whose payments had been suspended. In response, HSD provided the *Journal* with the names of the fifteen providers. In a June 26, 2013 article, "Big names in health care audit released," the *Journal* reported that "[f]ifteen nonpropfits whose payments were suspended after an audit the state Human Services Department said showed widespread mismanagement and possible fraud include some of the biggest New Mexico players in behavioral health." The *Journal* article identified the fifteen providers, including Plaintiffs, by name.

Plaintiffs filed their complaint on July 3, 2013. Plaintiffs seek "an order temporarily and permanently enjoining [HSD] from continuing to impose the payment suspension and continuing

5

to publicize the payment suspension and the allegations of wrongdoing until and unless each plaintiff is furnished a meaningful name-clearing hearing. . . ."  The Court understands Plaintiffs to be asserting two claims:  (1) a claim that HSD's unilateral suspension of payment has denied Plaintiffs of their property interest in the suspended payments without due process of law and (2) a "stigma-plus" claim that HSD's suspension of payment coupled with HSD's publication of the allegations of fraud has denied Plaintiffs of a liberty interest without due process of law.

**Standards for Granting a TRO**

"To merit a temporary restraining order ... the movant must establish that '(1) [it] has a substantial likelihood of prevailing on the merits; (2) [it] will suffer irreparable injury if [it] is denied the injunction; (3)  [its] threatened injury outweighs the injury that the opposing party will suffer under the injunction; and (4) an injunction would not be adverse to the public interest.'"  *Weichmann v. Ritter*,  No. 02-1146, 44 Fed. Appx. 346, 347 (10th Cir. July 26, 20-02) (unpublished decision) (quoting *Country Kids 'N City Slicks, Inc. v. Sheen*,  77 F.3d 1280, 1283 (10th Cir. 1996)).  It is the movant's burden to establish that each of these factors tips in [its] favor."  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).  Because Plaintiffs are seeking to enjoin "government action taken in the public interest pursuant to a statutory or regulatory scheme," the Court will not apply a less rigorous standard in evaluating the likelihood of success.  *Id.* at 1189.

**Due Process: Deprivation of Property**

"The first step in assessing a claimed procedural due process violation is to identify a constitutionally protected liberty or property interest." *Elwellv. Byers*, 699 F.3d 1208, 1213 (10th Cir. 2012). The Court understands Plaintiffs to be claiming a property interest in the suspended

payments.  Plaintiffs' deprivation of property claim fails at this first step.

Plaintiff's provider agreements state that "[i]f the PROVIDER obtains an excess payment or benefit willfully, by means of false statement, representation, concealment of any material fact, or other fraudulent scheme or devise with intent to defraud, criminal sentences and fines and/or civil monetary penalties shall be imposed pursuant to, but not limited to . . . 42 C.F.R. 455.23.  Subsection 455.23(a) *requires* a Medicaid agency such as HSD to "suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud. . . unless the agency has good cause to not suspend payments or to suspend payment only in part." Plaintiffs' provider agreements state, *inter alia*, that "[s]ubmission of false or miscoded claims or fraudulent representation may subject the PROVIDER to . . . sanctions specified in ...federal and state law and regulations;  that Services that have been billed to the DEPARTMENT or its AUTHORIZED AGENTS which are not substantiated in the PROVIDER'S record are subject to recoupments, sanction, and /or any other penalty provided for in this AGREEMENT; and that "[t]he DEPARTMENT or its AUTHORIZED AGENTS may recover funds by reducing future compensation payable by the DEPARTMENT or its AUTHORIZED AGENTS to the PROVIDER."   HSD regulations state that "[u]pon written notice, HSD may withhold all or a portion of provider payments on pending and subsequently received claims, to recover an overpayment, or may suspend payment on all pending or subsequently submitted claims pending a final determination of the amount of overpayment." NMAC 8.351.2.13©).

The Court concludes that Plaintiffs' right to payment is sufficiently qualified by federal and state law and by the terms of their provider agreements such that Plaintiffs cannot be said to

have a property right in immediate payment pending investigation of credible allegations of fraud. *Personal Care Products, Inc. v. Hawkins*, 635 F.3d 155 (5th Cir. 2011); *Yorktown Med. Lab., Inc. v. Perales*, 948 F.2d 84 (2d Cir. 1991). Under New Mexico law, a party to a contract has a duty to read and familiarize itself with the terms of its contract. *Ballard v. Chavez*, 117 N.M. 1, 3 (1994), and "[a] contract incorporates the relevant law, whether or not it is referred to in the agreement," *State ex rel. Udall v. Colonial Penn Ins. Co.*, 112 N.M. 123, 130 (1991). Thus, although Plaintiffs have a property interest in payment for services delivered to Medicaid recipients, the terms of Plaintiffs' provider agreements as well as federal and state law have carved out of that property interest the right to immediate payment while an investigation into credible allegations of fraud are pending. Because Plaintiffs have failed to establish a protected property interest in immediate payment under the circumstances described in their complaint, their deprivation of property claim necessarily fails.

      The Supreme Court's decision in *Lujan v. G & G Fire Sprinklers*, 532 U.S. 189 (2001), provides a complementary rationale for rejecting Plaintiffs' claim that they were denied property without due process. In *Lujan*, the federal plaintiff was a subcontractor on a state-funded public works contract. California law required contractors and subcontractors engaged in work on a public works contract to pay their workers a minimum wage, and allowed the State to withhold payment to cover the difference between the wages paid and the minimum wage required by law. The State concluded that the federal plaintiff-subcontractor had not paid the appropriate wage and directed the awarding entities to withhold part of the contract price to cover unpaid wages and penalties. The awarding entities partially withheld payment from the general contractor, who in turn withheld payment to the plaintiff-subcontractor. The plaintiff-subcontractor sued in

federal court alleging that the withholding of payment without a predeprivation hearing denied it procedural due process.  The district court held the state law unconstitutional and enjoined the State from enforcing it. On appeal, the Ninth Circuit Court of Appeals affirmed, finding that the subcontractor had a property interest in being paid in full for completed work, and that the subcontractor was denied due process of law because the State had not provided a pre- or post-deprivation hearing.  The State sought review in the Supreme Court, which granted certiorari, vacated the judgment, and remanded the case to the Court of Appeals for reconsideration in the light of *American Manufacturers Mutual Insurance Company v. Sullivan*, 526 U.S. 40 (1999). On remand, the Court of Appeals again affirmed, and the State once more petitioned for certiorari, which the Supreme Court granted.

The Supreme Court began with the observation that "[w]here a state law such as this is challenged on due process grounds, we inquire whether the State has deprived the claimant of a protected property interest, and whether the State's procedures comport with due process." 532 U.S. at 195.  The Court characterized the plaintiff's property interest as "only a claim that it did comply with [the contract] and therefore that it is entitled to be paid in full." *Id.* at 196.  The Court concluded that this property interest could be adequately protected by an ordinary breach of contract suit. *Id.* In other words, readily available state-law remedies provided all the process the plaintiff was due. The plaintiff argued that a suit for breach of contract was inadequate because the State would retain the withheld amounts pending the outcome of the breach of contract case, which could take several years.  The Supreme Court dismissed this argument:  "A lawsuit of that duration, while undoubtedly something of a hardship, cannot be said to deprive [plaintiff] of its claim for payment under the contract.  Lawsuits are not known for expeditiously

resolving claims, and the standard practice in breach-of-contract suits is to award damages, if appropriate, only at the conclusion of the case."  The Supreme Court reversed.

This Court, relying on *Lujan*, has held that a claim that the plaintiff has not been paid what it was owed on a contract with the government "is a simple breach of contract claim. . . adding more details about the way in which the contract was purportedly breached does not change that cause of action, nor does it convert it into a civil rights action." *Gannett Fleming West, Inc. v. Village of Angel Fire*, 375 F. Supp. 2d 1104 (D. N.M. 1104).

In a case decided prior to *Lujan*, a sister court reached a similar conclusion. *Bock Associates v. Chronister*, 951 F. Supp. 969 (D. Kan. 1997).  In *Bock,* the federal plaintiff was a provider of screening services for the State of Kansas' Medicaid program.  The State withheld payments for services, claiming that the provider had used unqualified assessors in breach of the contract and in violation of federal regulations.  The provider filed suit in federal court, claiming, *inter alia*, that the State had denied it its property interest in compensation for the services it performed without a meaningful opportunity to be heard prior to the deprivation.  The district court held in the alternative that either the right claimed by the plaintiff was not sufficient to trigger due process, or alternatively, that state law providing for an administrative hearing and judicial review provided all the process required by the Fourteenth Amendment.

New Mexico law affords Plaintiffs a hearing on their claim of entitlement to full payment. NMAC 8.353.2.  Alternately, Plaintiffs may have the right to bring a breach of contract action against HSD. *See*  NMSA 1978, § 37-1-23(A) (waiving State's immunity from suit for actions founded on a written contract).  Under *Lujan*, one or both of these remedies provides Plaintiffs the process they are due.

The Court concludes that Plaintiffs' deprivation of property claim has no realistic likelihood of success on its merits.

Turning to the requirements for granting a TRO, the Court concludes that the absence of a realistic likelihood of success on the merits by itself is fatal to Plaintiffs' request for interim injunctive relief based on Plaintiffs deprivation of property claim.  *Planned Parenthood of Minn., N.D., S.D. v. Rounds*,  530 F.3d 724, 737 (8th Cir. 2008);  *Global Horizons, Inc. v.U.S. Dept. of Labor* , 510 F.3d 1054, 1058 (9th Cir. 2007).  The Court will deny Plaintiffs request for a TRO ordering HSD to discontinue the suspension of payments.

**Due Process:  Deprivation of Liberty ("Stigma-Plus")**

The Court understands Plaintiffs to be claiming that without a "name clearing hearing," HSD's actions in suspending their payments and publicizing the allegations of fraudulent billing practices continues to deny them of liberty without due process of law.  Our Court of Appeals has recognized a cause of action for deprivation of liberty where a governmental employer  (1) makes "statements that impugn the good name, reputation, honor, or integrity of the employee";  (2) the statements are untrue;  (3) the statements occur in the course of terminating the employee or foreclose other employment opportunities; and (4) the statements are published.  *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994).   Drawing an analogy from the employment context to the present context is not difficult:  a cause of action for deprivation of liberty exists where a state agency  (1) makes statements that impugn the honesty or integrity of a Medicaid provider; (2) the statements are untrue; (3) the statements occur in the course of terminating the provider or foreclose other business opportunities; and (4) the statements are published.  *See Erickson v. United States e rel. Dept. Health and Human Services*,  67 F.3d 858, 862-63 (9th Cir. 1995)

(analyzing deprivation-of-liberty claim brought by excluded Medicare providers ).

Here, Plaintiffs have made a substantial showing with respect to elements one and four. Clearly, a statement that there exists credible evidence that a Medicaid provider has committed criminal fraud in billing for services tends to impugn the honesty or integrity of accused provider, and there is evidence that the statements were published and that HSD is at least in part responsible for the publication. Where Plaintiffs' case founders is with respect to the second and third elements.

With respect to the second prong, the Court begins with the observation that Plaintiffs face something of a "Catch-22," in that they have not been provided specific details of the charges, yet must show that the charges are not credible in order to prevail on their liberty interest claim. Plaintiffs' principal line of attack has been to attack the credibility of PCG based on the results of an audit PCG conducted for the State of North Carolina. Although his evidence would be fodder for cross examination at trial, it is insufficient to establish that PCG's New Mexico audit was unreliable.

With respect to the third prong, the Court begins by noting that as Plaintiffs have not been terminated as Medicaid providers, they must show that HSD's allegedly libelous statements have *foreclosed* other opportunities to engage in the business of providing behavioral health services, and not merely have made it more difficult to obtain other clients. *Sandoval v. City of Boulder*, 388 F.3d 1312, 1329 (10th Cir. 2004). This is an extremely demanding showing, and requires the plaintiff to show that the plaintiff has been excluded from its occupation in both the public and private sectors. *Id.* The principal evidence submitted by Plaintiffs is found in their affidavits. (The Court offered Plaintiffs the opportunity to put on evidence during the evidentiary hearing,

but Plaintiffs elected to stand on their affidavits.)  Plaintiffs' affidavits contain the following evidence of foreclosure of business opportunities:  "Consumers and referral sources have been contacting us to determine if the consumers should continue with us and if the referral sources should continue to refer." [Doc. 6-1, ¶ 5]  "I was notified on Friday [either June 28 or July 5, 2013] that we did not receive funding for Chavez County for Total Community Approach services, which we have been providing for two years. . . . I believe it is because of this accusation of fraud."  [Doc. 6-2, ¶ 8]  "We may lose other private contracts if this continues." [Doc. 6-4, ¶ 7]  "[Our] reputation  has been adversely affected, since coalitions that we are fiscal agent for are looking for other fiscal agents, based on the allegations and the fear that their funding will be impacted as well. . . . The community is asking questions, and is hesitant to make referrals to us."  [Doc. 6-5, ¶ 6]  "[Our] reputation has been damaged in our service area, and it will seriously hinder our ability to raise funds through grants, etc." [Doc. 6-6, ¶ 4]  "I believe that if we are not cleared of all allegations of fraud, etc., as published in the newspapers of New Mexico, we will lose most, if not all, non-Medicaid contracts in the near future." [Doc. 6-8, ¶ 5] This evidence, while somewhat anecdotal and conjectural, does tend to suggest that the stigma from the allegations of fraud is making it more difficult for Plaintiffs to obtain funding  or retain and attract clients.  However, Plaintiffs' evidence falls short of  showing that Plaintiffs have been *foreclosed* from engaging in the business of providing behavioral health services.  *Cf. Sandoval*, 388 F.3d at 1329 (evidence that plaintiff applied for and was rejected for approximately 100 positions for which she is qualified insufficient to demonstrate foreclosure from other employment).

      In contrast to its determination that Plaintiffs' procedural due process has no realistic

chance of success, the Court finds that Plaintiffs have made out a colorable, albeit weak, showing on their stigma-plus claim. However, they have not established a likelihood of success on the merits.

Turning to the four-part test for granting a TRO, the Court finds that the first prong tips in HSD's favor. Although Plaintiffs have established a possibility of success on the merits of their stigma-plus claim, their showing falls well short of establishing a likelihood of success on the merits.

As to the second factor, the Court begins by distinguishing two harms: (1) the harm to Plaintiffs from the continued withholding of payments and (2) the harm from the continuing denial of a name-clearing hearing. The Court has already determined that Plaintiffs have failed to make even a colorable showing that HSD violated Plaintiff's right to due process by suspending payments while the MFCU's investigation is pending. Therefore, since the suspension of payments has not been shown to be wrongful, the consequences of the suspension are not legally cognizable harm. Further, where, as here, the Plaintiffs have not established that they have a protected property interest in the "plus" component of their stigma-plus claim, the remedy for a stigma-plus violation is a name-clearing hearing, not reinstatement of the interest constituting the "plus." *See Brady v. Gebbie*, 859 F.2d 1543, 1551-52 (9th Cir. 1988) (holding that at-will employee is not entitled to reinstatement as a remedy for a deprivation of liberty in the course of termination of employment). Thus, in considering the harm to Plaintiffs from the denial of TRO based on their stigma-plus claim, the harm to Plaintiffs' from HSD's suspension of payments is irrelevant. Instead, the Court must focus on the harm associated with the stigma--*i.e.*, the foreclosure of other opportunities in the public or private sectors for Plaintiffs to engage in the

business of providing behavioral health services during the time it will take for the court to decide this case.

Plaintiffs argue that "due to the Eleventh Amendment and other potential immunity defenses, plaintiffs will be unable to collect damages from [HSD]. This fact alone was sufficient to constitute irreparable harm in *The Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*, [Civ. No. 08-633 MV/RLP (D.N.M. Oct. 3, 2008)]." [Doc. 6 at 13] The Court in *ACH&F* limited its analysis to immunity from state causes of action and did not address the availability of damages in a § 1983 individual capacity lawsuit. Here, due to their reliance on *ACH&F*'s incomplete analysis, Plaintiffs have failed to show that they are foreclosed from recovering damages in a § 1983 individual capacity lawsuit against the HSD employees and officials responsible for publishing the allegedly libelous statements.[5] At best, Plaintiff have established that if a TRO ordering a name clearing hearing is not issued they *may* lose funding and other business opportunities and that because of governmental immunity or difficulties in proving the value of these opportunities Plaintiffs *may* not be able to recover money damages as compensation for these lost opportunities. Because something more than a mere possibility of irreparable harm is required to justify a TRO or preliminary injunction, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008), this factor also tips in favor of HSD.

Turning to the third factor, the Court must decide whether the possibility that Plaintiffs

---

[5]It appears likely that the principal legal obstacle to individual capacity suits against HSD officials and employees would be the question of whether in late June, 2013 Plaintiffs' right to protection from a stigma-plus violation was clearly-established at the appropriate level of specificity. *Dixon v. Richer*, 922 F.2d 1456, 1463 n.2 (10th Cir.1991) (noting requirement that "the right the official is alleged to have violated was clearly established at a meaningful level of specificity").

may suffer ongoing loss of funding and business opportunities if a TRO is denied outweighs the harm to the State from requiring HSD to hold a name-clearing hearing while the MFCU's investigation is pending.  Although the Court does not doubt that the loss of funding and business opportunities could be a serious economic harm, Plaintiffs evidence is anecdotal and conjectural, reducing the weight to be accorded Plaintiffs' interests.   The State has an interest in not having to reveal the fruits of its investigation at a premature stage. [Doc. 22 at 19 (quoting *Bergerron v. Dept. of Health Serv.*, 71 Cal. App. 4th 17, 27 (Ct. App. 1999)].  The State also has an interest in adopting and enforcing an administrative scheme that it deems to be in the public interest. *Heideman*, 348 F.3d at 1190-91.  Lastly, the State also has an interest in avoiding the time and expense of an additional hearing.  *See McGrath v. Weinberger*, 541 F.2d 249, 254 (10th Cir. 1976).  Like many governmental interests, the first two are abstract, making for a difficult comparison with Plaintiffs' more concrete economic interests.  In view of Plaintiffs weak showing on the merits and their conjectural showing of harm, the Court concludes that the balance of interests tips slightly in favor of HSD.

    Lastly, the Court must consider whether Plaintiffs have demonstrated that the issuance of an injunction ordering HSD to afford Plaintiffs a name-clearing hearing prior to the termination of the MFCU's investigation is not adverse to the public interest.  There clearly exists a public interest in the uninterrupted delivery of behavioral health services to a population of particularly vulnerable Medicaid beneficiaries.  Although as previously noted, the remedy for a stigma-plus violation is a name-clearing hearing, not the reinstatement of payments, an outcome favorable to Plaintiffs in a name-clearing hearing easily could provide grounds for discontinuing the suspension of payments.  See 42 C.F.R. § 455.23(c) ("All suspension of payment will be

temporary and will not continue after . . . [t]he agency or the prosecuting authorities determine that there is insufficient evidence of fraud by the provider.").  Furthermore, the issue in a name-clearing hearing will be whether HSD had a basis in late June 2013 for asserting that there existed credible allegations of fraud, not whether Plaintiffs actually committed fraud.  Since the existence in June 2013 of credible allegations of fraud largely turns on the reliability of the PCG audit, not evidence subsequently developed by the MFCU, a name-clearing hearing could be limited in scope so as to avoid interference with the MFCU's ongoing investigation.  Ultimately, however, the question of where public interest lies turns upon the likelihood that the outcome of a name-clearing hearing would be favorable to Plaintiffs.  A name-clearing hearing that confirms the existence of credible allegations of fraud would leave the Medicaid recipients served by Plaintiffs where they are now.  The State's interests in avoiding the cost of an additional hearing and premature disclosure of its fraud case are not dependent on the outcome of the hearing.  Because the Court has determined that Plaintiffs have not established a likelihood of success on the merits, the Court concludes that Plaintiffs have failed to show that an injunction requiring a prompt name-clearing hearing is not adverse to the public interest.  This factor tips in favor of HSD.

Having considered the four factors, and having determined that none of the factors tips in Plaintiffs favor, the Court must deny Plaintiffs' request for a TRO requiring a name-clearing hearing.

**Conclusion**

Plaintiffs have failed to fulfill their heavy burden to establish that they are entitled to the extraordinary remedy of a TRO.  Accordingly, Plaintiffs' *Motion for a Temporary Restraining Order* will be denied.

The Court recognizes that its ruling today on Plaintiffs' motion affects not only Plaintiffs and HSD, but Plaintiffs' clients, an absent and thus silent class of particularly vulnerable individuals who are in need of the mental health services provided by Plaintiffs. Indeed, Plaintiffs' clients include individuals with homicidal and suicidal ideation, children in foster care homes, and individuals dependent on psychotropic drugs. Many of these clients have developed beneficial therapeutic relationships with Plaintiffs' health care clinicians, who have not been accused of any wrongdoing by HSD. In fact, at the hearing, counsel for HSD stated that the credible allegations of fraud did not in any way reflect on the services provided by Plaintiffs' health care clinicians. Nonetheless, it is a concern of this Court that despite HSD's efforts to ensure continuity of care, as represented by its counsel at hearing, there could be a disruption of the delivery of critical mental health services in some instances. The Court is not insensitive to this outcome, but is constrained by the prevailing law and the credible allegations of fraud against Plaintiffs, all as explained above.

**WHEREFORE, IT IS HEREBY ORDERED** that Plaintiffs' *Motion for a Temporary Restraining Order* [Doc. 5] is **denied**.

So ordered this 25th day of July, 2013.

_____
M. CHRISTINA ARMIJO
Chief United States Judge